**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

Glen Stewart,

        *Plaintiff,*

v.

Caleb Loftin, Justin Morris, Doe Officers 1-5,
Lamar Davis in his official capacity as the
Superintendent of the Louisiana State Police, Gary
Gilley in his official capacity as Sheriff of the
Richland Parish Sheriff's Office, and Doe
Insurance Companies 1-10,

        *Defendants.*

**CIVIL ACTION NO. 3:21-cv-03789**

**JURY TRIAL DEMANDED**

## COMPLAINT

    Glen Stewart asserts that Caleb Loftin, Justin Morris, Doe Officers 1-5, Lamar Davis in his

official capacity as the Superintendent of the Louisiana State Police ("LSP"), and Gary Gilley in his

official capacity as Sheriff of the Richland Parish Sheriff's Office (RPSO) violated his constitutional

rights and Louisiana law as follows:

### I.      NATURE OF THE ACTION

    1.      Plaintiff Glen Stewart is a 52-year-old Black man living in Delhi, Louisiana.

    2.      Defendants Caleb Loftin, Justin Morris, Doe Officers 1-5, Lamar Davis, and Gary

Gilley subjected Mr. Stewart to a laundry list of constitutional violations and police brutality, similar

to that experienced by countless Black Americans at the hands of law enforcement every single day.

    3.      Mr. Stewart's nightmare began as he ate a hamburger in his car while driving home

on the evening of November 7, 2020. Consistent with a *de facto* policy in the RPSO, Defendant

Caleb Loftin pulled Mr. Stewart over for no reason other than the fact that Mr. Stewart is Black.

Later that night, one or more Defendants intentionally falsified the police report to try and conceal

the unlawful stop.

4.      After being stopped, Mr. Stewart presented his insurance documents to Loftin, who responded—without provocation or reason—by drawing his firearm and pointing it directly in Mr. Stewart's face while falsely shouting, "Gun! You have a gun!"

5.      Given the obvious pretense of Loftin's assertion, Mr. Stewart believed he was about to be killed. Accordingly, he drove to his home a mile and a half away. All the while, he was closely followed by Loftin in his law enforcement vehicle. Once home, Mr. Stewart immediately exited his vehicle, in clear sight of Loftin, with his hands in the air. As Mr. Stewart faced away from Loftin, per Loftin's instructions, with his hands raised high, Loftin remarked, "I can tell you're scared," and then repeatedly told a terrified Mr. Stewart: "you did nothing wrong."

6.      Once other officers arrived on the scene, Mr. Stewart was handcuffed without incident. Then, as Mr. Stewart stood handcuffed beside Loftin's patrol vehicle, officers performed an illegal search of Mr. Stewart's vehicle, claiming to be looking for a gun.

7.      Mr. Stewart's wife had been on the front porch since Mr. Stewart parked his car, fearfully watching the interactions between her terrified husband and law enforcement. Loftin yelled at her, demanding to know where the gun was; Mr. Stewart's wife truthfully responded that neither she nor Glen owned any guns.

8.      Visibly frustrated, Loftin and other officers then led Mr. Stewart to another officer's patrol vehicle. While handcuffed and standing next to that vehicle, Loftin stated to Mr. Stewart, "you know you fucked up, don't you?" To the contrary, Mr. Stewart had no idea what Loftin was referencing, as he had been doing nothing other than eating a hamburger in his car when he was stopped.

9.      Again, without provocation or justification, Loftin and three other officers unlawfully tackled him to the ground, held his handcuffed arms above him, and then proceeded to physically beat and tase Mr. Stewart until he could not breathe, was visibly shaking, and was pleading

to his nearby wife: "don't let them kill me."

10.     Significantly, one of Mr. Stewart's assailants was Justin Morris, an LSP Trooper.  On information and belief, Morris, the LSP trooper who beat Mr. Stewart on Nov. 7, 2020 is a longtime trooper in LSP's infamous "Troop F." Troop F is currently "under internal investigation by a secret panel over whether its officers are systematically targeting Black motorists for abuse."[1] Troop F is also under active federal investigation by the Department of Justice and Federal Bureau of Investigation for "incidents … that resulted in death or bodily injury to arrestees."[2]

11.     Mr. Stewart's mistreatment at the hands of Louisiana law enforcement on the evening of November 7 and morning of November 8 is not unique. Countless Black Americans are subjected to similar mistreatment every day. The Louisiana State Police and the RPSO in particular are repeat offenders.

12.     In just May of this year, another Black man, Antonio Harris, filed suit in this very Court alleging shocking deprivations of his rights similar to those suffered by Mr. Stewart. *See Harris v. Brown, et al.*, Case No. 3:21-cv-01332-TAD-KDM (W.D. La., Complaint, filed May 19, 2021). Mr. Harris was pulled over for a minor traffic violation and fled that officer out of fear. *Id.* ¶¶ 15-16. When Mr. Harris's vehicle was stopped, he exited the vehicle and immediately surrendered to the LSP Troopers by lying face down on the ground with his hands extended from his body and his legs spread apart. *Id.* ¶ 18. Despite his immediate and unconditional surrender—just as with Mr. Stewart—the Troopers brutally beat and suffocated Mr. Harris. *Id.* ¶¶ 19-21. Mr. Harris was then transferred to RPSO custody where he repeatedly requested and was denied medical assistance.

---

[1] Jim Mustian, *AP: Louisiana Police Unit Probed Over Black Driver Arrests*, AP NEWS (June 10, 2021), https://apnews.com/article/la-state-wire-louisiana-death-of-ronald-greene-arrests-4a47c5e0ef720019d15818cf32eb2a2a.

[2] Press Release, Western District of Louisiana Department of Justice, Former Louisiana State Police Trooper Indicted on Civil Rights Charge for Assaulting Arrestee (Sept. 23, 2021), https://www.justice.gov/usao-wdla/pr/former-louisiana-state-police-trooper-indicted-civil-rights-charge-assaulting-arrestee.

*Id.* ¶¶ 83-89.

13.     Returning to Mr. Stewart's night of abuse, it did not end with his violent beatings at the hands of multiple law enforcement officers. Rather, after the police tired of violently assaulting Mr. Stewart, he was returned to his feet, gasping for air. Mr. Stewart's wife begged the police to give Mr. Stewart his inhaler, explaining that he had asthma and was clearly unable to breathe. Mr. Stewart's wife handed the inhaler to the officers, who eventually took it and gave it to Mr. Stewart. However, inexplicably, before Mr. Stewart was able to get sufficient air into his lungs, an officer took the inhaler *away* from Mr. Stewart.

14.     Mr. Stewart was then transported to the Franklink Parish jail. The officers' confiscation of Mr. Stewart's inhaler—coupled with their preceding vicious attacks that left him gasping for air—resulted in Mr. Stewart losing consciousness while being transported to the jail.

15.     While Mr. Stewart was in police custody and *en route* to the jail, the police proceeded to conduct *another* unlawful search of his vehicle, claiming to Mrs. Stewart that they were still searching for the gun. But, just as the officers had previously come up empty-handed, their second and more prolonged search again resulted in no gun being discovered—which was inevitable because no gun had ever existed.

16.     After this prolonged second search that revealed no gun, Defendants announced they were nonetheless seizing the vehicle, claiming—falsely—to have found marijuana during their second search. But the marijuana purportedly "found" by the police had been simultaneously planted in the vehicle by the officers. The officers similarly retrieved a never-opened beer bottle from a cooler sitting in the second row of Mr. Stewart's Suburban during the second unlawful search, opened it, and then staged it in the front cupholder of Mr. Stewart's vehicle and photographed it as "evidence." This elaborate scheme by the police to conceal their criminal conduct and justify their unlawful behavior while at Mr. Stewart's home was only the beginning of

the officers' cover-up.

17.     Mr. Stewart's nightmare did not end once he arrived at the Franklin Parish jail. At the jail, Mr. Stewart consented to a breathalyzer test, but the breathalyzer could not obtain a reading because, while now conscious, Mr. Stewart still did not have enough air in his lungs to effectively use the testing machine. Mr. Stewart requested that he be allowed to use his inhaler to properly breathe into the machine. He knew that doing so would result in a favorable breathalyzer reading. But the police refused to provide him with his inhaler. Instead, Defendant Morris notated on police records that Mr. Stewart had "refused" a breathalyzer test—another outright falsehood.

18.     The Defendants' unlawful conduct further caused Mr. Stewart to be detained for seven days. At no point during Mr. Stewart's week-long detention did the Defendants, or anyone else, notify Mr. Stewart of the charges against him or why he was being held.

19.     Mr. Stewart brings suit under 42 U.S.C. § 1983 based on Defendants' acts and omissions set forth above, which deprived him of his clearly established rights under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution. Mr. Stewart also asserts that the Defendants are liable to him for assault, battery, and intentional infliction of emotional distress based on the Defendants' acts and omissions, including, but not limited to, their pointing a gun in his face, beating him, tasing him, suffocating him, and then failing to inform him of any charges against him while he was unlawfully detained for seven days.

## II.      PARTIES

20.     Plaintiff Glen Stewart is a resident of Franklin Parish, Louisiana.

21.     Defendant Caleb Loftin is a resident of Delhi, Louisiana. He is a Deputy of the RPSO, Badge #RP57. He is sued in his individual capacity. At all relevant times, he was acting under color of the law of the State of Louisiana.

22.     Defendant Justin Morris is a resident of West Monroe, Louisiana. He is a LSP

Trooper, Badge #2297. He is sued in his individual capacity. At all relevant times, he was acting under color of the law of the State of Louisiana.

23.     Defendants Doe Officers 1-5 are as yet unidentified law enforcement agents within the State of Louisiana that appeared on Mr. Stewart's property on the evening of November 7, 2020. They are sued in their individual capacities and they were, at all relevant times, acting under color of the law of the State of Louisiana.

24.     Defendant Lamar Davis is the Superintendent of the Louisiana State Police and is the principal and final policymaker of the LSP. He establishes the policies, practices, and customs used by the LSP, and is responsible for the hiring, firing, training, and the supervision of all officers in the LSP, including Defendant Morris. Defendant Davis is sued in his official capacity.

25.     Defendant Gary Gilley is the Sheriff of Richland Parish and is the principal and final policymaker of Richland Parish. He establishes the policies, practices, and customs used by the RPSO. He is responsible for the hiring, firing, training, and supervision of all officers in RPSO. Gilley and the RPSO hired and employed Defendant Loftin. Defendant Gilley is sued in his official capacity.

26.     Defendant Doe Insurance Companies 1-10 are yet unknown insurance agencies that are doing business in the State of Louisiana and, on information and belief, have issued and currently have in effect one or more policies of insurance covering one or more of the Defendants named herein.

27.     All defendants are jointly and severally liable for the tortious and unconstitutional conduct set forth herein.

### III.     JURISDICTION AND VENUE

28.     Jurisdiction is proper in this Court pursuant to 18 U.S.C. §§ 1331 and 1343 because Mr. Stewart's causes of action arise under the Constitution and laws of the United States, including

28 U.S.C. § 1983. The Court has supplemental jurisdiction over Plaintiff's Louisiana state law claims pursuant to 28 U.S.C. § 1367.

29.     Venue is proper in the Western District of Louisiana pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Mr. Stewart's causes of action occurred in the Western District of Louisiana. Venue is also appropriate because, on information and belief, Defendants Loftin, Morris, and Gilley are all residents of the Western District of Louisiana.

## IV.     STATEMENT OF FACTS

### A.     Deputy Loftin Pulled Mr. Stewart Over Because of His Race and then Unjustifiably Pointed a Gun in Mr. Stewart's Face.

30.     On the evening of November 7, 2020, Mr. Stewart picked up a hamburger from Burger King before driving home for the night. As he ate his burger on the drive, he passed Defendant Loftin going in the other direction. Upon passing Mr. Stewart, Loftin turned around, pulled behind Mr. Stewart and turned on the emergency lights to his patrol vehicle. Mr. Stewart immediately pulled over.

31.     Loftin approached Mr. Stewart's vehicle on the driver's side and identified himself to Mr. Stewart using a false name. As Loftin approached, Mr. Stewart observed an unknown blonde woman sitting in the passenger seat of Loftin's patrol vehicle.

32.     Loftin told Mr. Stewart that he was being pulled over for driving 75 MPH in a 55 MPH zone. That was false. Mr. Stewart was not violating any laws at the time that he was pulled over by Loftin.

33.     Earlier that same day, in fact, Mr. Stewart had heard from friends (specifically, Ricky Patterson and Bobby Harvey), that RPSO officers had been targeting Black men, pulling them over, and justifying the stops by falsely accusing their Black targets of the exact same "violation" utilized

by Loftin on November 7 against Mr. Stewart: driving 75 MPH in a 55 MPH zone. Thus, when Mr. Stewart was falsely accused by Loftin of the same "75 in a 55" violation, he told Loftin that he was "not going to fall for that gimmick."

34.     On information and belief, conducting pretextual traffic stops on the basis of race is such a pervasive policy, practice, and custom in the RPSO that it has become a *de facto* policy.

35.     When Loftin demanded to see his driver's license and proof of auto insurance, Mr. Stewart produced them and gave them to Loftin. Loftin walked to his patrol vehicle with the documents provided by Mr. Stewart, and then moments later returned to Mr. Stewart's vehicle to tell him that he had provided the wrong documents. Mr. Stewart disagreed and, indeed, the blonde woman in Loftin's patrol vehicle advised Loftin from the patrol car's loudspeaker that Mr. Stewart's license and insurance were both valid.

36.     When Loftin nevertheless continued to insist that Mr. Stewart had produced the wrong documents, Mr. Stewart opened his glove compartment to search for any other documents that might satisfy Loftin's demands.

37.     As Mr. Stewart withdrew some papers from the glove compartment, Loftin began yelling, falsely, "Gun! You have a gun!" Loftin's contention had no basis in fact; Mr. Stewart did not have a gun nor any other object that even remotely resembled a gun. There was no gun anywhere in the vehicle.

38.     While yelling his falsehood about Mr. Stewart having a gun, Loftin simultaneously unholstered his service pistol and pointed it from less than a foot away directly at Mr. Stewart's face. Believing that Loftin intended to kill him, Mr. Stewart immediately and instinctively hit the gas pedal of his Suburban.[3] He drove straight to his nearby home, roughly a mile and a half from where he

---

[3] *See, e.g., Commonwealth v. Warren*, 58 N.E.3d 333, 342 (Mass. 2016) (holding that where Black men are "disproportionately and repeatedly targeted" by law enforcement, flight from apprehension "add[s] nothing to the reasonable suspicion calculus" and is "totally unrelated to consciousness of guilt").

had been pulled over. *En route* to his home, Mr. Stewart called his wife asking her to go outside and wait for his arrival so that she could be a witness to Loftin's conduct, which he hoped would deter Loftin from murdering him.

**B.    After Handcuffing Mr. Stewart, Police Officers Then Beat and Tased Him for No Reason.**

39.    Mr. Stewart arrived at his home minutes later with Loftin right behind him. Mr. Stewart immediately exited the vehicle with his hands in the air. For several minutes, Loftin instructed Mr. Stewart to remain still with his hands in the air until additional law enforcement agents arrived. Mr. Stewart complied. Loftin pointed a gun at Mr. Stewart for that entire period. Several times during that period, Loftin assured Mr. Stewart he had "done nothing wrong," and acknowledged that he could tell Mr. Stewart was scared.

40.    Once other officers had arrived, Loftin instructed Mr. Stewart to walk backwards toward him. Mr. Stewart again did as he was instructed, and an officer placed Mr. Stewart in handcuffs. As a Doe Officer was handcuffing Mr. Stewart, Loftin once again assured Mr. Stewart that "[he] didn't do anything wrong; the only thing [he] did wrong was run." Shortly after being handcuffed, several more police officers arrived at Mr. Stewart's home.

41.    While Mr. Stewart stood handcuffed by Loftin's patrol vehicle, officers conducted their first illegal search of Mr. Stewart's Suburban. They claimed to be looking for a gun. Loftin called out to Mr. Stewart's wife, who remained on the porch, and asked where Mr. Stewart had put his gun. Mr. Stewart's wife replied that there was no gun; neither she nor Mr. Stewart own any guns.

42.    Upon Loftin's inability to locate a gun that never existed, Mr. Stewart perceived a clear change in Loftin's attitude.

43.    Visibly frustrated, Loftin led Mr. Stewart, still handcuffed, to another patrol vehicle. As he stood handcuffed beside the patrol vehicle, Mr. Stewart was then surrounded by four law enforcement officers: Loftin, Morris, and two Doe Officers. Without any provocation or reason, the

four officers violently pushed Mr. Stewart's head to the ground, then pushed his handcuffed arms into the air.

44.     The four officers then punched Mr. Stewart. Then, adding further insult to injury, the officers tased Mr. Stewart. During this attack, one of the officers told Mr. Stewart: "You know you fucked up, don't you?" Mr. Stewart cried out to his nearby wife in terror begging her, "don't let them kill me."

45.     Mr. Stewart did nothing to provoke, justify, or warrant this physical assault. Mr. Stewart did not pose a threat to anybody's safety at any time on the evening of November 7, 2020, and at no time after he arrived at his house did Mr.  Stewart resist arrest or attempt to evade arrest. Rather, he complied with the instructions he was given, the vast majority of which occurred when his hands were restrained behind his back.

46.     Unable to adequately breathe and gasping for air, Mr. Stewart pleaded to the officers that he could not breath. He asked for his asthma inhaler. Loftin obtained the inhaler from Mr. Stewart's wife. He then offered it to Mr. Stewart, but then proceeded to take it away from him before he could get sufficient air into his lungs.

47.     After being beaten and still gasping for air, Mr. Stewart was placed into a patrol vehicle, which transported him to the Franklin Parish jail. During that drive, Mr. Stewart still could not adequately breathe and, as a result, lost consciousness while handcuffed in the patrol vehicle. A Doe Officer witnessed Mr. Stewart's loss of consciousness, evidenced by the fact that the Officer asked Mr. Stewart whether he was okay after he regained consciousness. Mr. Stewart informed the Doe Officer that he still could not breathe, that his handcuffs were on so tight that his fingers were numb, and that pain was radiating through his elbow. Consistent with the intentional maliciousness of the Defendants' actions throughout the evening, the Doe Officer responded by tightening the handcuffs, causing Mr. Stewart lasting pain. On information and belief, at no time while he was

-10-

unconscious did any officer attempt to provide medical assistance or otherwise attempt to discern Mr. Stewart's medical status.

**C.    The Unlawful Conduct Inflicted on Mr. Stewart by the Louisiana State Police and Morris is Nearly Identical to the Excessive Force Inflicted by Them on Two Other Black Men.**

48.    That Morris, a Louisiana State Trooper, participated in beating Mr. Stewart is noteworthy. Mere months ago, LSP Troopers made national news for unjustifiably attacking another Black man—Antonio Harris—at the border between Richland and Franklin Parishes. *Harris v. Brown, et al.*, Case No. 3:21-cv-01332-TAD-KDM (W.D. La., Complaint, filed May 19, 2021). Harris was pulled over in Richland Parish by LSP Troopers. After being scared by those Troopers, Harris fled in his vehicle, until his vehicle was stopped in pursuit. Upon being stopped, Harris immediately exited his vehicle and surrendered to police by lying face down with his arms away from his body and his legs spread apart. LSP Troopers then brutally beat Harris, and later boastfully texted each other about how their beating would cause Harris "nightmares for a long time."[4]

49.    On information and belief, Morris personally was involved in *another* racially motivated LSP excessive force incident in 2019. In that case, too, a Black man named Morgan Blake (whom Morris had pulled over) was thrown to the ground and beaten by Morris's colleagues, with Morris standing nearby, after the Black suspect was already in handcuffs and not in any way resisting arrest.[5]

50.    The LSP troopers involved in Mr. Stewart's beating, Mr. Harris's beating, and Mr. Blake's beating were all members of an LSP troop named "Troop F." Troop F is a small but

---

[4] Timothy Bella, *State Troopers Texted About the "Whoopin" They Gave a Black Man, Record Show: "He's Gonna Have Nightmares,"* WASHINGTON POST (March 13, 2021, 4:29 PM), https://www.washingtonpost.com/nation/2021/03/13/louisiana-police-black-man-text.
[5] Perry Robinson and Matthew Segura, *Details of July 2019 Incident that Led to LSP Excessive Force Arrest*, KALB (Feb 10, 2021, 4:47 PM), https://www.kalb.com/2021/02/11/details-of-july-2019-incident-that-led-to-lsp-excessive-force-arrest.

notoriously violent division within the LSP that is currently under investigation for precisely the conduct set forth in this Complaint: using excessive force against Black men.[6] In 2020 Troop F made national news for killing Ronald Greene, another Black man who surrendered after a high-speed chase.[7] Mr. Greene was repeatedly tased, punched, choked, and beaten by four LSP troopers in Troop F until he was left facedown for several minutes and eventually died. The LSP then tried to cover-up their violent misconduct, falsely telling Mr. Greene's family that Mr. Greene had died upon impact after crashing his vehicle into a tree—a complete fabrication designed to conceal LSP's horrific conduct. More than a year would pass before LSP finally opened an internal investigation into Mr. Greene's murder.

51.     In fact, recently, on September 23, 2021, the United States Department of Justice indicted Jacob Brown, a former Trooper within the LSP's Troop F, for his assault of Aaron Bowman, also a Black man. In the course of arresting Mr. Bowman, after pulling him over for a routine traffic violation, Brown repeatedly struck Mr. Bowman in the head and body with a metal flashlight.[8] It was recently reported that, by 2015, Brown had racked up 23 use of force complaints, 19 of which were against Black people.[9]

52.     That LSP's Troop F routinely assaults unarmed, nonviolent Black men cannot be ignored or tolerated any longer. A recent whistleblower within the LSP, Mr. Carl Cavalier, confirmed that the LSP includes officers who act as "killers" and "people who are OK with the killers being on

[6] Associated Press, *Louisiana Police Unit Probed Over Black Driver Arrests After Death of Ronald Greene*, NBC (June 10, 2021 7:18 AM), https://www.nbcnews.com/news/us-news/louisiana-police-unit-probed-over-black-driver-arrests-after-death-n1270283.
[7] Dan Levin and Michael Levenson, *What We Know About Ronald Greene's Death*, NY TIMES (June 11, 2021), https://www.nytimes.com/article/ronald-greene-video-louisiana.html.
[8] Press Release, Western District of Louisiana Department of Justice, Former Louisiana State Police Trooper Indicted on Civil Rights Charge for Assaulting Arrestee (Sept. 23, 2021), https://www.justice.gov/usao-wdla/pr/former-louisiana-state-police-trooper-indicted-civil-rights-charge-assaulting-arrestee.
[9] Jim Mustian & Jake Bleiberg, *In Louisiana, a Father, a Son and a Culture of Police Abuse*, AP NEWS (Oct. 26, 2021), https://apnews.com/article/business-louisiana-race-and-ethnicity-racial-injustice-baton-rouge-d2d50979a247c400746ba6703225f7ff.

the job."[10] Mr. Cavalier also identified the scope of LSP's policy, practice, and custom, explaining he "couldn't go up the ladder because up the ladder is part of the problem. Up the ladder is some of the people perceived to be committing these criminal acts."[11] Dozens of current and former state troopers with the LSP have described "a culture of impunity, nepotism and in some cases outright racism."[12] In fact, 67% of LSP troopers' use of force targeted Black people in recent years, more than double the percentage of the Black population in Louisiana.[13]

      53.    Defendant Davis has "acknowledged that the state police have lost the public's trust, due in part to an 'old-fashioned culture' in Louisiana's northern parishes in which some troopers are conditioned to punish anyone who runs from them or disrespects the badge."[14] On information and belief, Richland and Franklin Parishes are two such "northern parishes" where this "old-fashioned culture" has contributed to the LSP's defacto policy, practice, and custom to target Black men. In an example indicative of the widespread culture of racial profiling and racial violence against Black men, Lee Harrell, the former sheriff of the RPSO defended the placement of a Confederate flag in a former LSP trooper's office, commenting that no one objected to the flag because "it's history."[15]

      54.    Mr. Stewart's experience in November 2020, as recounted in this Complaint, is not an isolated, atypical, or fantastical encounter. Rather, it is the unwritten policy, practice, and custom of the LSP to intentionally target Black men and violate their well-established rights by using unjustified and unwarranted physical force, as evidenced by numerous other well-documented accounts of unlawful treatment of Black men in the region by law enforcement. When an LSP

---

[10] Derek Hawkins, *A Black State Trooper Spoke out About Police Brutality. Louisiana Police Want to Fire Him*, WASHINGTON POST (Oct. 14, 2021), https://www.washingtonpost.com/nation/2021/10/14/louisiana-state-trooper-brutality.
[11] *Id.*
[12] Mustian & Bleiberg, *supra* note 9.
[13] *Id.*
[14] *Id.*
[15] *Id.*

officer dares to bring this policy, practice, and custom to light, he is silenced. For example, Mr. Cavalier was put on unpaid leave for five weeks and LSP recently moved to terminate Mr. Cavalier for violating policies, practices, and customs related to "loyalty with the department" and "conduct unbecoming of an officer.[16] On information and belief, the known instances of LSP's unlawful treatment of Black men is but a fraction of those that have occurred, and that continue to occur.

**D.    Defendants Falsified Documents Associated with Mr. Stewart's Arrest and Detention.**

55.    Once Mr. Stewart had been unjustifiably taken to the Franklin Parish jail, other Doe Officers and Loftin remained at Mr. Stewart's home. These Doe Officers searched Mr. Stewart's vehicle again, for a long period of time, claiming to be looking for a gun in the vehicle. Neither Mr. Stewart nor his wife consented to any search, and no officer sought consent from either of them. No gun was ever found, as Mr. Stewart does not own a gun nor keep a gun in his vehicle.

56.    In addition to performing an unconstitutional search, the Doe Officers and Loftin ultimately planted evidence in Mr. Stewart's vehicle to "justify" their conduct that night. Specifically, Mr. Stewart had a full and unopened bottle of Coors Light in a cooler (along with water and Gatorade) in the backseat of his Suburban. On information and belief, Loftin and/or one of the Doe Officers removed that bottle from the cooler, opened it, removed beer from the bottle, placed the bottle in the front seat cupholders, and then photographed it as "evidence" to support a fraudulent DWI charge. A DWI charge had never so much as been mentioned as a basis for stopping, arresting, or searching Mr. Stewart. In fact, Mr. Stewart was not made aware that he had been arrested for, or charged with, a DWI until days after his arrest, when he reviewed the paperwork related to securing a bond.

57.    Loftin and the Doe Officers similarly planted an unknown substance in Mr. Stewart's

---

[16] Hawkins, *supra* note 10.

-14-

vehicle. Mr. Stewart had several prescription pill bottles in his car, all belonging to Mr. Stewart's wife who suffers a significant and life-altering medical condition necessitating numerous prescriptions.

58.     On information and belief, Loftin and Doe Officers placed an unknown material (purportedly marijuana) into one of those pill bottles and then photographed it, again as "evidence" to support a fraudulent possession charge. This was another false charge never mentioned as a basis for unlawfully stopping and arresting Mr. Stewart, or searching his vehicle, until days later, when Mr. Stewart was provided paperwork associated with his bail.

59.     The two lengthy searches of the car on the Stewarts' property provided Defendants ample additional opportunity to stage and plant evidence in Mr. Stewart's Suburban. Moreover, Defendants had an unknown period of time with the Suburban after Mr. Stewart's arrest, as they impounded and held the car in their custody.

60.     After searching the automobile Mr. Stewart had been driving, the Doe Officers then inexplicably and without justification attempted to search other vehicles on Mr. Stewart's premises. Their unlawful efforts were unsuccessful as the vehicles were locked.

61.     As he arrived at the Franklin Parish jail, Morris asked Mr. Stewart to undergo a field sobriety test. Morris did not tell him why. No officer ever told Mr. Stewart that he had been arrested for driving under the influence of alcohol. Mr. Stewart passed each of the sobriety tests—because he had not been drinking—except that Mr. Stewart could not stand on his right leg alone; Mr. Stewart had previously undergone a total knee replacement in his right leg. Standing on his right leg alone is very difficult for Mr. Stewart. Notwithstanding these facts, Morris falsified the field sobriety report, misrepresenting the results by indicating that Mr. Stewart had failed every test Morris had given him.

62.     Mr. Stewart also expressly consented to a breathalyzer test. Morris attempted to conduct the test, but the test was inconclusive due to the beatings and terror to which he had been subjected. Mr. Stewart had not recovered his full breath and did not have enough air in his lungs for

the test to properly function. Mr. Stewart requested he be allowed to use his asthma inhaler before

again attempting to breathe into the equipment. But Morris refused Mr. Stewart's request. Then,

instead of accurately recording that Defendants had refused Mr. Stewart the means necessary for

him to intake sufficient oxygen to take the breathalyzer test, Morris falsely recorded on official

documents that Mr. Stewart had refused to take the test.

63.     Mr. Stewart was then formally taken into custody by RPSO police officers, who

falsely noted in their own arrest report that Mr. Stewart had "refused to give a proper sample" as to

the breathalyzer test administered at the Franklin Parish jail. Mr. Stewart was then held in the

Richland Parish Detention Center for almost a week until bond was posted.

64.     Neither at the time of his arrest nor at any point during his detention was

Mr. Stewart notified of his *Miranda* rights. Mr. Stewart was similarly never notified at any time during

his detention of why he had been arrested, why he was being detained, or what crimes he was being

charged with committing. Notwithstanding, discovery in connection with Mr. Stewart's criminal

proceedings revealed a "Statement of Rights" purported to have been signed by Mr. Stewart.[17] The

"Statement of Rights" does not include Mr. Stewart's real signature. On information and belief, the

signature on that document was forged by law enforcement personnel.

**E.     Mr. Stewart Suffered Significant and Lasting Harm and has Continued Medical Issues and Emotional Distress.**

65.     Defendants' unconstitutional and tortious conduct has caused Mr. Stewart several

significant and lasting harms. From the physical beating and excessively tightened handcuffs,

Mr. Stewart suffered arm and hand injuries that left him sore for several weeks. Mr. Stewart also has

scarring on his skin as a result of Defendants' excessive use of a taser.

66.     Since the events that occurred on November 7 and 8, 2020, and as a result of those

---

[17] Attached as Exhibit A.

events, Mr. Stewart has been diagnosed with Post-Traumatic Stress Disorder (PTSD) and suffered at least one anxiety attack to date. Mr. Stewart has been prescribed and is being required to pay for Paroxetine in an attempt to treat his PTSD.

67.     All of the above-described acts were done by the Defendants' intentionally, knowingly, willfully, wantonly, maliciously and/or recklessly in disregard for Mr. Stewart's federally and state protected rights, and were done while acting under color of state law.

68.     On information and belief, certain Defendant police officers may also have a history of citizen complaints and/or discipline.

69.     As a direct and proximate result of the wrongful conduct in which each of the Defendants engaged, Mr. Stewart has been substantially injured. Mr. Stewart's injuries include, but are not limited to, loss of federal and state constitutional rights, physical injuries, impairments, scarring, great pain and emotional distress.

70.     Mr Stewart continues to suffer ongoing emotional distress, has been diagnosed with PTSD, and suffers from anxiety, stress, anger, and frustration from being mistreated by law enforcement. Mr. Stewart also suffered significant financial damage resulting from the falsified charges against him. For instance, in order to retain his driver's license, Mr. Stewart was required to pay for the installation of an ignition interlock on his vehicle. Worse, Mr. Stewart previously made a living as a professional driver, necessitating a Louisiana Chauffeur License. The manufactured charges, as detailed herein, resulted in a suspension of the Chauffeur License such that Mr. Stewart has been stripped of his primary source of income.

## V.   CAUSE OF ACTION 1

### Violation of 42 U.S.C. § 1983

### Excessive Force – Fourth and Fourteenth Amendments

### (Defendants Loftin, Morris, Doe Officers 1-5, Doe Insurance Companies 1-10)

71.     Mr. Stewart repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

72.     Defendants Loftin, Morris, and Doe Officers 1-5 deployed objectively unreasonable force against Mr. Stewart after he was handcuffed. Specifically—after Mr. Stewart had already repeatedly and compliantly followed all instructions by law enforcement, was handcuffed, and had not in any manner resisted apprehension—Defendants physically punched, beat, and tased Mr. Stewart on his own property in front of his wife. A Doe Officer used additional excessive force in tightening the handcuffs restraining Mr. Stewart after Mr. Stewart advised that the handcuffs had cut off blood circulation to his hands and were radiating pain up through his elbow.

73.     At the time that those officers used excessive force on Mr. Stewart, there were no factual circumstances that would have led a reasonable person to believe that Mr. Stewart posed any threat to any person, or that any force was required to effectuate Mr. Stewart's arrest or transport him to jail. Those officers' use of force was patently excessive and objectively unreasonable.

74.     Defendants' excessive use of force on Mr. Stewart directly and proximately caused compensable injury to Mr. Stewart.

75.     On information and belief, Doe Insurance Companies 1-10 have issued and/or currently have in effect one or more policies of insurance covering Defendants and the actions alleged herein and are jointly and severally liable for any and all damages arising from the injuries suffered by Mr. Stewart.

## VI.     CAUSE OF ACTION 2

### Violation of 42 U.S.C. § 1983

### Deliberate Indifference to Medical Needs - Fourteenth Amendment

### (Defendants Loftin, Morris, Doe Officers 1-5, Doe Insurance Companies 1-10)

76.     Mr. Stewart repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

77.     Defendants Loftin, Morris, and Doe Officers 1-5 exhibited deliberate indifference to Mr. Stewart's serious medical needs, as specifically alleged above, in violation of Mr. Stewart's Fourteenth Amendment rights. Those Defendants were aware or should have been aware that Mr. Stewart was asthmatic, in need of his inhaler, and requiring immediate medical attention during and after those Defendants' assault of Mr. Stewart. Mr. Stewart complained that he could not breathe, displayed obvious symptoms of respiratory distress, and lost consciousness.

78.     Despite Mr. Stewart's obvious need for medical assistance, those Defendants did not attempt to obtain it for him, nor did they make any effort to assess his medical status or render aid to him, despite a well-established duty to do so.

79.     The failure of those Defendants to obtain medical assistance for Mr. Stewart in response to his need for medical assistance constituted deliberate indifference to Mr. Stewart's serious medical needs.

80.     Those Defendants' deliberate indifference to those needs directly and proximately caused compensable injury to Mr. Stewart.

81.     On information and belief, Doe Insurance Companies 1-10 have issued and/or currently have in effect one or more policies of insurance covering Loftin, Morris, and/or Doe Officers 1-5 and the actions alleged herein and are jointly and severally liable for any and all damages arising from the injuries suffered by Mr. Stewart.

## VII.    CAUSE OF ACTION 3

### Violation of 42 U.S.C. § 1983

### Failure to Intervene in Use of Excessive Force – Fourth and Fourteenth Amendments
### (Defendants Loftin, Morris, Doe Officers 1-5, Doe Insurance Companies 1-10)

82.    Mr. Steward repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

83.    Each of the Defendants present during Mr. Stewart's beating and excessive force used by their colleagues against Mr. Stewart and had ample time to intervene in order to prevent or mitigate injury to him.

84.    Any reasonable police officer in the position of the Defendants would have recognized that the force being used against Mr. Stewart was unconstitutionally excessive and would have known that they had a duty to take reasonable measures to prevent harm to Mr. Stewart.

85.    Defendants failed to take any action to prevent harm to Mr. Stewart and thereby proximately caused unconstitutionally excessive force to be inflicted upon Mr. Stewart. That unconstitutional force resulted in grave physical injuries and psychiatric distress to Mr. Stewart.

86.    In depriving Mr. Stewart of his rights under the United States Constitution, the Defendants acted under color of law in their respective capacities as LSP and RPSO officers, and their actions and omissions were conducted within the scope of their respective official duties or employment. This deprivation under color of law is actionable under, and may be redressed by, 42 U.S.C. § 1983.

87.    On information and belief, Doe Insurance Companies 1-10 have issued and/or currently have in effect one or more policies of insurance covering Loftin, Morris and/or Doe Officers 1-5 and the actions alleged herein and are jointly and severally liable for any and all damages arising from the injuries suffered by Mr. Stewart.

## VIII.   CAUSE OF ACTION 4

### Battery

### (Defendants Loftin, Morris, Doe Officers 1-5, Doe Insurance Companies 1-10)

88.      Mr. Stewart repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

89.      Defendants Loftin, Morris, and Doe Officers 1-5 intentionally and harmfully made physical contact with Mr. Stewart after they had already placed him in handcuffs and while he was not in any manner a threat or resisting. Specifically, they punched him, beat him, and tased him unreasonably. Each of those Defendants intended to cause Mr. Stewart harm.

90.      Defendants' battery directly injured Mr. Stewart and Mr. Stewart was harmed as a result of the contact.

91.      On information and belief, Doe Insurance Companies 1-10 have issued and/or currently have in effect one or more policies of insurance covering Loftin, Morris and/or Doe Officers 1-5 and the actions alleged herein and are jointly and severally liable for any and all damages arising from the injuries suffered by Mr. Stewart.

## IX.      CAUSE OF ACTION 5

### Assault

### (Defendants Loftin, Morris, Doe Officers 1-5, Doe Insurance Companies 1-10)

92.      Mr. Stewart repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

93.      As explained above, Defendants Loftin, Morris, and Doe Officers 1-5 intentionally and harmfully made physical contact with Mr. Stewart after they had already placed him in handcuffs and while he was not in any manner a threat or resisting. Specifically, they punched him, beat him, and tased him unreasonably. Each of those defendants intended to cause Mr. Stewart harm.

94.     Defendants Loftin, Morris, and Doe Officers 1-5 assaulted Mr. Stewart by threatening to cause imminent harmful contact with him. Beyond the imminent threat to commit the batteries above, Defendant Loftin in fact assaulted Mr. Stewart by unreasonably pointing a gun at Mr. Stewart on multiple occasions and threatening to shoot him when Mr. Stewart presented no danger to Loftin or anyone else.

95.     Defendants' assault directly and proximately caused compensable injury to him.

96.     On information and belief, Doe Insurance Companies 1-10 have issued and/or currently have in effect one or more policies of insurance covering Loftin, Morris and/or Doe Officers 1-5 and the actions alleged herein and are jointly and severally liable for any and all damages arising from the injuries suffered by Mr. Stewart.

## X.      CAUSE OF ACTION 6
### Intentional Infliction of Emotional Distress
### (Defendants Loftin, Morris, Doe Officers 1-5, Doe Insurance Companies 1-10)

97.     Mr. Stewart repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

98.     Mr. Stewart asserts violations of Louisiana law relative to intentional torts by Defendants Loftin, Morris, and Doe Officers 1-5, all of whom were acting within the course and scope of their employment with the LSP and RSPO. At all relevant times, Defendants were acting under the color of state law.

99.     The acts or omissions of these Defendants, as described herein, deprived Mr. Stewart of his constitutional rights and caused him other damages.

100.     As a direct and proximate result of the intentional acts of the Defendants described herein, carried out in reckless disregard, falsity and/or without sufficient factual information, Mr. Stewart suffered economic damage including loss of gainful employment, was caused physical injury,

psychiatric distress, and continues to suffer from PTSD, distress, anguish, sorrow, depression and loss of enjoyment of life.

101.    The aforesaid physical and psychological injuries sustained by Mr. Stewart were caused wholly by reason of the intentional, reckless, and/or negligent acts of the Defendants as described herein.

102.    The Defendants engaged in extreme and outrageous conduct, and acted maliciously and with specific intent to oppress and harm Mr. Stewart and/or with reckless disregard of the consequences of their actions and omissions, and as a result Mr. Stewart is entitled to damages in an amount to be proven at trial.

103.    On information and belief, Doe Insurance Companies 1-10 have issued and/or currently have in effect one or more policies of insurance covering Loftin, Morris and/or Doe Officers 1-5 and the actions alleged herein and are jointly and severally liable for any and all damages arising from the injuries suffered by Mr. Stewart.

## XI.      CAUSE OF ACTION 7
### Violation of 42 U.S.C. § 1983
### *Monell* Liability – Pretextual Seizures
### (Defendants Gilley, Doe Insurance Companies 1-10)

104.    Mr. Stewart repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

105.    The actions of Loftin in seizing Mr. Stewart violated Mr. Stewart's rights as guaranteed by the Fourth and Fourteenth Amendments, as alleged above.

106.    Loftin and Gilley (along with Doe Insurance Companies 1-10), acting together and under color of law, engaged in a course of conduct and otherwise conspired among themselves to commit those acts described herein and to deprive Mr. Stewart of his constitutional rights as set

forth herein.

107.     Gilley had the power to prevent or aid in the prevention of the wrongs done and conspired to be done as described herein yet failed or refused to do so in violation of 42 U.S.C. § 1983.

108.     The RPSO (through Gilley) has developed and maintained formal or informal policies, practices, and customs exhibiting deliberate indifference to the constitutional rights of individuals in Richland Parish, which caused the violation of Mr. Stewart's rights, as described herein, and the resultant damages suffered. These policies, practices, and customs include:

i.    Failing to properly train, supervise, or discipline police officers and supervisors regarding constitutional traffic stops; and

ii.   Contributing to the development of, or otherwise failing to stop, a racially-motivated municipal-wide policy, practice, and custom of seizing individuals under false pretenses—chiefly, claiming that the stopped individuals were speeding when they were not.

109.     RPSO and Gilley's acts and omissions as described herein were done with deliberate indifference to Mr. Stewart's constitutional rights. RPSO acted maliciously, willfully, wantonly, and in reckless disregard of Mr. Stewart's rights.

110.     RPSO's policy, practice, and custom of seizing Black drivers under false pretenses violates the equal protection clause of the Fourteenth Amendment. On information and belief, RPSO is motivated by racial discrimination in developing and applying that policy, practice, and custom. On information and belief, RPSO treats Black drivers differently than they would white drivers, and that different treatment stems from RPSO's discriminatory intent.

111.     Defendants' actions toward Mr. Stewart directly and proximately caused compensable injury to him.

112.    On information and belief, Doe Insurance Companies 1-10 have issued and/or currently have in effect one or more policies of insurance covering RPSO and/or Gilley and the actions alleged herein and are jointly and severally liable for any and all damages arising from the injuries suffered by Mr. Stewart.

## XII.    CAUSE OF ACTION 8
### Violation of 42 U.S.C. § 1983
### *Monell* Liability - Excessive Force – Fourth, Eighth, and Fourteenth Amendments
### (Defendants Gilley, Doe Insurance Companies 1-10)

113.    Mr. Stewart repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

114.    Defendants Loftin and Doe Officers 1-5 deployed objectively unreasonable force against Mr. Stewart after Loftin had already placed Mr. Stewart in handcuffs. Specifically—after demonstrating compliance and while he was already handcuffed and not in any way resisting apprehension—those Defendants physically punched, beat, and tased Mr. Stewart on his own property. A Doe Officer also unnecessarily used excessive force in tightening the handcuffs restraining Mr. Stewart, essentially retaliating after Mr. Stewart advised that the handcuffs had cut off blood circulation to his hands and were radiating pain up through his elbow.

115.    At the time that those officers used excessive force on Mr. Stewart, there were no factual circumstances that would have led a reasonable person to believe that Mr. Stewart posed any threat to any person, or that any force was required to effectuate Mr. Stewart's arrest or transport to jail. Those officers' use of force was patently excessive to any need, and that excessiveness was objectively unreasonable.

116.    The RPSO (through Gilley) has developed and maintained formal or informal policies, practices, and customs exhibiting deliberate indifference to the constitutional rights of

-25-

individuals in Richland Parish, which caused violations of Mr. Stewart's rights, as described herein, and the resultant damages suffered. These policies, practices and customs include the following:

i)  Failing to properly screen before hiring and failing to properly supervise, discipline, train or control police officers and supervisors under its jurisdiction and control, including the defendant officers, supervisors, and commanders;

ii)  Failing to provide adequate or reasonable supervision, discipline, monitoring or control of officers, including of the specifically named individual defendants herein;

iii)  Failing to take reasonable and necessary steps to properly investigate, charge, maintain, or defend disciplinary action for misconduct against officers or supervisors;

iv)  Failing to take appropriate remedial action for officers believed to have previously used excessive force;

v)  Failing to properly train, supervise, or discipline police officers and supervisors regarding the appropriate use of force;

vi)  Condoning, approving, or authorizing a culture and environment within the RPSO in which personnel, including the individual defendants named herein, had the reasonable belief or expectation that their actions would not be properly monitored by supervisory officers and that their misconduct would not be thoroughly investigated or sanctioned and would instead be tolerated; and

vii)  Contributing to the development of, or otherwise failing to stop, a racially-motivated municipal-wide policy, practice, and custom of using excessive force against Black citizens.

117.     RPSO's acts and omissions as described herein were done with deliberate indifference to Mr. Stewart's constitutional rights. RPSO acted maliciously, willfully, wantonly, and in reckless disregard of Mr. Stewart's rights.

118.     RPSO's acts and omissions directly and proximately caused compensable injury to Mr. Stewart.

119.     On information and belief, Doe Insurance Companies 1-10 have issued and/or currently have in effect one or more policies of insurance covering RPSO and/or Gilley and the actions alleged herein and are jointly and severally liable for any and all damages arising from the injuries suffered by Mr. Stewart.

## XIII.   CAUSE OF ACTION 9
### Declaratory Judgment
### *Monell* Liability - Excessive Force – Fourth, Eighth, and Fourteenth Amendments
### (Defendant Davis, Doe Insurance Companies 1-10)

120.     Mr. Stewart repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

121.     Defendants Loftin, Morris, and Doe Officers 1-5 deployed objectively unreasonable force against Mr. Stewart after Loftin had already placed Mr. Stewart in handcuffs. Specifically— after demonstrating compliance and while he was already handcuffed and not in any way resisting apprehension—those Defendants physically punched, beat, and tased Mr. Stewart on his own property. A Doe Officer also unnecessarily used excessive force in tightening the handcuffs restraining Mr. Stewart, essentially retaliating after Mr. Stewart advised that the handcuffs had cut off blood circulation to his hands and were radiating pain up through his elbow.

122.     At the time that those officers used excessive force on Mr. Stewart, there were no factual circumstances that would have led a reasonable person to believe that Mr. Stewart posed any threat to any person, or that any force was required to effectuate Mr. Stewart's arrest or transport to jail. Those officers' use of force was patently excessive to any need, and that excessiveness was objectively unreasonable.

123.     The LSP have a demonstrable history of using excessive force against Black men. In addition to Morris's participation in assaulting Mr. Stewart, the LSP's predilection for racial violence

has been exposed through their 2019 killing of Ronald Greene and their brutal 2020 assault of Antonio Harris.

124.    The LSP (through Davis) have developed and maintained formal or informal policies, practices, and customs exhibiting deliberate indifference to the constitutional rights of individuals in Louisiana, which caused violations of Mr. Stewart's rights, as described herein, and the resultant damages suffered. These policies, practices and customs include the following:

i) Failing to properly screen before hiring and failing to properly supervise, discipline, train or control police officers and supervisors under its jurisdiction and control, including the defendant officers, supervisors, and commanders;

ii) Failing to provide adequate or reasonable supervision, discipline, monitoring or control of officers, including of the specifically named individual defendants herein;

iii) Failing to take reasonable and necessary steps to properly investigate, charge, maintain, or defend disciplinary action for misconduct against officers or supervisors;

iv) Failing to take appropriate remedial action for officers believed to have previously used excessive force;

v) Failing to properly train, supervise, or discipline police officers and supervisors regarding the appropriate use of force;

vi) Condoning, approving, or authorizing a culture and environment within the LSP in which personnel, including the individual defendants named herein, had the reasonable belief or expectation that their actions would not be properly monitored by supervisory officers and that their misconduct would not be thoroughly investigated or sanctioned and would instead be tolerated; and

vii) Contributing to the development of, or otherwise failing to stop, a racially-motivated municipal-wide policy, practice, and custom of using excessive force against Black citizens within Louisiana.

125.    LSP's acts and omissions as described herein were done with deliberate indifference

to Mr. Stewart's constitutional rights. LSP acted maliciously, willfully, wantonly, and in reckless disregard of Mr. Stewart's rights.

126.     Mr. Stewart therefore seeks a declaration under 28 U.S.C. § 2201 that the conduct of the LSP (through Davis), as alleged herein, violated Mr. Stewart's rights under the Fourth, Eighth, and/or Fourteenth Amendments. There is an actual controversy within this Court's jurisdiction between Mr. Stewart and Davis regarding the deprivation of Mr. Stewart's rights.

## XIV.   CAUSE OF ACTION 10
### Violation of 42 U.S.C. § 1983
### Unreasonable Seizure (Traffic Stop) – Fourth and Fourteenth Amendments
### (Defendants Loftin, Doe Insurance Companies 1-10)

127.     Mr. Stewart repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

128.     Defendant Loftin seized Mr. Stewart using force and words a reasonable person would be afraid to ignore by pulling over Mr. Stewart using the sirens and flashing lights on Loftin's police vehicle, and then by pulling a firearm on Mr. Stewart.

129.     At the time Defendant Loftin seized him, Mr. Stewart had clearly established rights under the Fourth and Fourteenth Amendments to be free from unreasonable search and seizure.

130.     Defendant Loftin's seizure of Mr. Stewart was objectively unreasonable, because of the facts and circumstances complained of herein, including that Mr. Stewart was not violating any laws at the time of his seizure. Instead, Loftin stopped Mr. Stewart for nothing more than his race.

131.     Defendant Loftin's seizure of Mr. Stewart directly and proximately caused compensable injury to him.

132.     On information and belief, Doe Insurance Companies 1-10 have issued and/or currently have in effect one or more policies of insurance covering Loftin and his actions alleged

herein and are jointly and severally liable for any and all damages arising from the injuries suffered by Mr. Stewart.

## XV.    CAUSE OF ACTION 11
### Violation of 42 U.S.C. § 1983
### Illegal Search – Fourth and Fourteenth Amendments
### (Defendants Loftin, Doe Officers 1-5, Doe Insurance Companies 1-10)

133.    Mr. Stewart repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

134.    Loftin and Doe Officers 1-5 unlawfully searched Mr. Stewart's vehicle, as specifically alleged above, in violation of Mr. Stewart's Fourth and Fourteenth Amendment rights. Loftin and Doe Officers 1-5 first unlawfully searched Mr. Stewart's vehicle shortly after handcuffing Mr. Stewart, while Mr. Stewart stood by Loftin's patrol vehicle. Doe Officers 1-5 then unlawfully searched Mr. Stewart's vehicle again, after Mr. Stewart had been removed from his property.

135.    Both searches of his vehicle were illegal because: (1) his arrest was illegal; (2) they were conducted after Mr. Stewart had been arrested and detained (and the second search conducted after he had even been removed from his property altogether); and/or (3) they were conducted without a search warrant, on his property.

136.    Neither Mr. Stewart nor his wife consented to either search. No exigent circumstance justified either search of the vehicle.

137.    The unlawful searches of Mr. Stewart's property directly and proximately caused compensable injury to him.

138.    On information and belief, Doe Insurance Companies 1-10 have issued and/or currently have in effect one or more policies of insurance covering Loftin and Doe Officers 1-5 and the actions alleged herein and are jointly and severally liable for any and all damages arising from the

injuries suffered by Mr. Stewart.

## XVI.   CAUSE OF ACTION 12

### Violation of 42 U.S.C. § 1983

### Due Process Violation – Falsification of Arrest Records

### (Defendants Morris, Doe Insurance Companies 1-10)

139.    Mr. Stewart repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

140.    As previously alleged, Mr. Stewart was charged with driving under the influence in part or in whole because of a document that falsely reflected that he "refused" a breathalyzer test. To the contrary, as explained above, Mr. Stewart consented to a breathalyzer test but lacked sufficient air in his lungs to complete the test as a result of the Defendants' attacking him and then refusing to provide him reasonable access to his inhaler. On information and belief, it was Morris who falsely noted Mr. Stewart's "refusal" to complete the breathalyzer test on police records.

141.    Morris's falsification of the breathalyzer incident deprived Mr. Stewart of his procedural due process rights under the Fourteenth Amendment of the U.S. Constitution.

142.    Morris's actions toward Mr. Stewart directly and proximately caused compensable injury to him.

143.    On information and belief, Doe Insurance Companies 1-10 have issued and/or currently have in effect one or more policies of insurance covering Morris and his actions alleged herein and are jointly and severally liable for any and all damages arising from the injuries suffered by Mr. Stewart.

## XVII.  JURY DEMAND

Plaintiff demands trial by jury.

## XVIII. PRAYER FOR RELIEF

Plaintiff requests that the Court enter judgment in his favor and against each of the
Defendants and award the following relief:

i.  Declaration that Defendants' conduct violated the Fourth, Eighth, and Fourteenth
Amendments to the United States Constitution;

ii.  Compensatory and consequential damages, including damages for emotional distress,
pain and suffering, and pecuniary losses on all claims allowed by law in an amount to be
determined at trial;

iii.  Compensation for economic losses on all claims allowed by law in an amount to be
proven at trial;

iv.  Punitive damages on all claims allowed by law in an amount to be determined at trial

v.  Attorneys' fees and costs associated with this action, including expert witness fees, on all
claims allowed by law;

vi.  Pre- and post- judgment interest at the lawful rate; and

vii.  Any other relief the Court deems just and proper.

Dated:  October 27, 2021

Respectfully submitted,

/s/

Megan E. Snider (Trial Attorney) (SBN LA 33382)
msnider@laaclu.org
Nora S. Ahmed* (SBN NY 5092374)
nahmed@laaclu.org
ACLU FOUNDATION OF LOUISIANA
1340 Poydras St, Ste. 2160
New Orleans, LA 70112
(t) 504 522 0628

Mary Z. Gaston* (SBN WA 27258)
MGaston@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099

(t) 206 359 9000

Hayden M. Schottlaender* (SBN TX 24098391)
HSchottlaender@perkinscoie.com
PERKINS COIE LLP
500 N. Akard Street, Suite 3300
Dallas, Texas 75201
(t) 214 965 7724

Abby L. Bloetscher* (SBN CA 312759)
ABloetscher@perkinscoie.com
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, California 94105
(t) 415 344 7040

*Pro Hac Vice Application Forthcoming

**Counsel for Glen Stewart**