## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

Glen Stewart,

            *Plaintiff*,

v.

Caleb Loftin, Justin Morris, Doe Officers 1-5, Lamar Davis in his official capacity as the Superintendent of the Louisiana State Police, Gary Gilley in his official capacity as Sheriff of the Richland Parish Sheriff's Office and in his official capacity as Records Custodian for Richland Parish Sheriff's Office, and Doe Insurance Companies 1-10,

            *Defendants*.

**CIVIL ACTION NO. 3:21-CV-03789**

**JUDGE TERRY A. DOUGHTY**

**MAG. JUDGE KAREN L. HAYES**

**JURY TRIAL DEMANDED**

### FIRST AMENDED COMPLAINT

Glen Stewart asserts that Caleb Loftin, Justin Morris, Doe Officers 1-5, Lamar Davis in his official capacity as the Superintendent of the Louisiana State Police ("LSP"), and Gary Gilley in his official capacity as Sheriff of the Richland Parish Sheriff's Office (RPSO) violated his constitutional rights and Louisiana law as follows:

### I.   NATURE OF THE ACTION

1.   Plaintiff Glen Stewart is a 52-year-old Black man living in Delhi, Louisiana.

2.   Defendants Caleb Loftin, Justin Morris, Doe Officers 1-5, Lamar Davis, and Gary Gilley subjected Mr. Stewart to a laundry list of constitutional violations and police brutality, similar to that experienced by countless Black Americans at the hands of law enforcement every single day.

3.   Mr. Stewart's nightmare began as he ate a hamburger in his car while driving home on the evening of November 7, 2020. Consistent with a *de facto* policy in the RPSO, Defendant Caleb Loftin pulled Mr. Stewart over for no reason other than the fact that Mr. Stewart is Black. Later that night, one or more Defendants intentionally falsified the police report to try and conceal

the unlawful stop.

4.      After being stopped, Mr. Stewart presented his insurance documents to Loftin, who responded—without provocation or reason—by drawing his firearm and pointing it directly in Mr. Stewart's face while falsely shouting, "Gun! You have a gun!"

5.      Given the obvious pretense of Loftin's assertion, Mr. Stewart believed he was about to be killed. Accordingly, he drove to his home a mile and a half away. All the while, he was closely followed by Loftin in his law enforcement vehicle. Once home, Mr. Stewart immediately exited his vehicle, in clear sight of Loftin, with his hands in the air. As Mr. Stewart faced away from Loftin, per Loftin's instructions, with his hands raised high, Loftin remarked, "I can tell you're scared," and then repeatedly told a terrified Mr. Stewart: "you did nothing wrong."

6.      Once other officers arrived on the scene, Mr. Stewart was handcuffed without incident. Then, as Mr. Stewart stood handcuffed beside Loftin's patrol vehicle, officers performed an illegal search of Mr. Stewart's vehicle, claiming to be looking for a gun.

7.      Mr. Stewart's wife had been on the front porch since Mr. Stewart parked his car, fearfully watching the interactions between her terrified husband and law enforcement. Loftin yelled at her, demanding to know where the gun was; Mr. Stewart's wife truthfully responded that neither she nor Glen owned any guns.

8.      Visibly frustrated, Loftin and other officers then led Mr. Stewart to another officer's patrol vehicle. While handcuffed and standing next to that vehicle, Loftin stated to Mr. Stewart, "you know you fucked up, don't you?" To the contrary, Mr. Stewart had no idea what Loftin was referencing, as he had been doing nothing other than eating a hamburger in his car when he was stopped.

9.      Again, without provocation or justification, Loftin and three other officers unlawfully tackled him to the ground, held his handcuffed arms above him, and then proceeded to

-2-

physically beat and tase Mr. Stewart until he could not breathe, was visibly shaking, and was pleading to his nearby wife: "don't let them kill me."

10.     Significantly, one of Mr. Stewart's assailants was Justin Morris, an LSP Trooper. On information and belief, Morris, the LSP trooper who beat Mr. Stewart on November 7, 2020 is a longtime trooper in LSP's infamous "Troop F." Troop F is currently "under internal investigation by a secret panel over whether its officers are systematically targeting Black motorists for abuse."[1] Troop F is also under active federal investigation by the Department of Justice and Federal Bureau of Investigation for "incidents … that resulted in death or bodily injury to arrestees."[2]

11.     Mr. Stewart's mistreatment at the hands of Louisiana law enforcement on the evening of November 7 and morning of November 8 is not unique. Countless Black Americans are subjected to similar mistreatment every day. The Louisiana State Police and the RPSO in particular are repeat offenders.

12.     In just May of this year, another Black man, Antonio Harris, filed suit in this very Court alleging shocking deprivations of his rights similar to those suffered by Mr. Stewart. *See* Complaint, *Harris v. Brown, et al.*, Case No. 3:21-cv-01332-TAD-KDM (W.D. La. May 19, 2021). Mr. Harris was pulled over for a minor traffic violation and fled that officer out of fear. *Id.* ¶¶ 15-16. When Mr. Harris's vehicle was stopped, he exited the vehicle and immediately surrendered to the LSP Troopers by lying face down on the ground with his hands extended from his body and his legs spread apart. *Id.* ¶ 18. Despite his immediate and unconditional surrender—just as with Mr. Stewart—the Troopers brutally beat and suffocated Mr. Harris. *Id.* ¶¶ 19-21. Mr. Harris was

---

[1] Jim Mustian, *AP: Louisiana Police Unit Probed Over Black Driver Arrests*, AP NEWS (June 10, 2021), https://apnews.com/article/la-state-wire-louisiana-death-of-ronald-greene-arrests-4a47c5e0ef720019d15818cf32eb2a2a.

[2] Press Release, Western District of Louisiana Department of Justice, Former Louisiana State Police Trooper Indicted on Civil Rights Charge for Assaulting Arrestee (Sept. 23, 2021), https://www.justice.gov/usao-wdla/pr/former-louisiana-state-police-trooper-indicted-civil-rights-charge-assaulting-arrestee.

then transferred to RPSO custody where he repeatedly requested and was denied medical assistance. *Id.* ¶¶ 83-89.

13.     Mr. Harris sued various officers, as well as RPSO Sheriff Gary Gilley and LSP Superintendent Lamar Davis, in their individual and official capacities. *Id.* ¶ 4. Defendant Davis, "with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted or ratified a number of customs, patterns, or practices of their codefendants that failed to provide for the safety of arrestees, detainees, and the like during arrest, including but not limited to during the handcuffing and restraint process" *Id.* ¶ 80. RPSO Sheriff Gilley "took no action to provide medical assistance to [Mr.] Harris in the days following the brutal attack and false arrest." *Id.* ¶ 97. Mr. Harris highlighted that "[i]t is the policy or custom of Sheriff Gilley . . . to inadequately supervise, train, and/or correct [RPSO's] police officers[.]" *Id.* ¶ 105.

14.     Returning to Mr. Stewart's night of abuse, it did not end with his violent beatings at the hands of multiple law enforcement officers. Rather, after the police tired of violently assaulting Mr. Stewart, he was returned to his feet, gasping for air. Mr. Stewart's wife begged the police to give Mr. Stewart his inhaler, explaining that he had asthma and was clearly unable to breathe. Mr. Stewart's wife handed the inhaler to the officers, who eventually took it and gave it to Mr. Stewart. However, inexplicably, before Mr. Stewart was able to get sufficient air into his lungs, an officer took the inhaler *away* from Mr. Stewart.

15.     Mr. Stewart was then transported to the Franklin Parish jail. The officers' confiscation of Mr. Stewart's inhaler—coupled with their preceding vicious attacks that left him gasping for air—resulted in Mr. Stewart losing consciousness while being transported to the jail.

16.     While Mr. Stewart was in police custody and *en route* to the jail, the police proceeded to conduct *another* unlawful search of his vehicle, claiming to Mrs. Stewart that they were still searching for the gun. But, just as the officers had previously come up empty-handed, their second

-4-

and more prolonged search again resulted in no gun being discovered—which was inevitable because no gun had ever existed.

17.     After this prolonged second search that revealed no gun, Defendants announced they were nonetheless seizing the vehicle, claiming—falsely—to have found marijuana during their second search. But the marijuana purportedly "found" by the police had been simultaneously planted in the vehicle by the officers. The officers similarly retrieved a never-opened beer bottle from a cooler sitting in the second row of Mr. Stewart's Suburban during the second unlawful search, opened it, and then staged it in the front cupholder of Mr. Stewart's vehicle and photographed it as "evidence." This elaborate scheme by the police to conceal their criminal conduct and justify their unlawful behavior while at Mr. Stewart's home was only the beginning of the officers' cover-up.

18.     Mr. Stewart's nightmare did not end once he arrived at the Franklin Parish jail. At the jail, Mr. Stewart consented to a breathalyzer test, but the breathalyzer could not obtain a reading because, while now conscious, Mr. Stewart still did not have enough air in his lungs to effectively use the testing machine. Mr. Stewart requested that he be allowed to use his inhaler to properly breathe into the machine. He knew that doing so would result in a favorable breathalyzer reading. But the police refused to provide him with his inhaler. Instead, Defendant Morris notated on police records that Mr. Stewart had "refused" a breathalyzer test—another outright falsehood.

19.     The Defendants' unlawful conduct further caused Mr. Stewart to be detained for seven days. At no point during Mr. Stewart's week-long detention did the Defendants, or anyone else, notify Mr. Stewart of the charges against him or why he was being held.

20.     Mr. Stewart brings suit under 42 U.S.C. § 1983 based on Defendants' acts and omissions set forth above, which deprived him of his clearly established rights under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution. Mr. Stewart also asserts that

the Defendants are liable to him for assault, battery, and intentional infliction of emotional distress based on the Defendants' acts and omissions, including, but not limited to, their pointing a gun in his face, beating him, tasing him, suffocating him, and then failing to inform him of any charges against him while he was unlawfully detained for seven days.

## II.     PARTIES

21.     Plaintiff Glen Stewart is a resident of Franklin Parish, Louisiana.

22.     Defendant Caleb Loftin is a resident of Delhi, Louisiana. He is a Deputy of the RPSO, Badge #RP57. He is sued in his individual capacity. At all relevant times, he was acting under color of the law of the State of Louisiana.

23.     Defendant Justin Morris is a resident of West Monroe, Louisiana. He is a LSP Trooper, Badge #2297. He is sued in his individual capacity. At all relevant times, he was acting under color of the law of the State of Louisiana.

24.     Defendants Doe Officers 1-5 are as yet unidentified law enforcement agents within the State of Louisiana that appeared on Mr. Stewart's property on the evening of November 7, 2020. They are sued in their individual capacities and they were, at all relevant times, acting under color of the law of the State of Louisiana.

25.     Defendant Lamar Davis is the Superintendent of the Louisiana State Police and is the principal and final policymaker of the LSP. He establishes the policies, practices, and customs used by the LSP, and is responsible for the hiring, firing, training, and the supervision of all officers in the LSP, including Defendant Morris. Defendant Davis is sued in his official capacity.

26.     Defendant Gary Gilley is the Sheriff of Richland Parish and is the principal and final policymaker of Richland Parish. He establishes the policies, practices, and customs used by the RPSO. He is responsible for the hiring, firing, training, and supervision of all officers in RPSO. Gilley and the RPSO hired and employed Defendant Loftin. Upon information and belief, Gilley is

-6-

also the records custodian for RPSO. Defendant Gilley is sued in his official capacity as Sheriff and as records custodian for RPSO.

27.     Defendant Doe Insurance Companies 1-10 are yet unknown insurance agencies that are doing business in the State of Louisiana and, on information and belief, have issued and currently have in effect one or more policies of insurance covering one or more of the Defendants named herein.

28.     All defendants are jointly and severally liable for the tortious and unconstitutional conduct set forth herein.

### III.     JURISDICTION AND VENUE

29.     Jurisdiction is proper in this Court pursuant to 18 U.S.C. §§ 1331 and 1343 because Mr. Stewart's causes of action arise under the Constitution and laws of the United States, including 28 U.S.C. § 1983. The Court has supplemental jurisdiction over Plaintiff's Louisiana state law claims pursuant to 28 U.S.C. § 1367.

30.     Venue is proper in the Western District of Louisiana pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Mr. Stewart's causes of action occurred in the Western District of Louisiana. Venue is also appropriate because, on information and belief, Defendants Loftin, Morris, and Gilley are all residents of the Western District of Louisiana.

### IV.     STATEMENT OF FACTS

**A.     Deputy Loftin Pulled Mr. Stewart Over Because of His Race and then Unjustifiably Pointed a Gun in Mr. Stewart's Face.**

31.     On the evening of November 7, 2020, Mr. Stewart picked up a hamburger from Burger King before driving home for the night. As he ate his burger on the drive, he passed

155058993.1

Defendant Loftin going in the other direction. Upon passing Mr. Stewart, Loftin turned around, pulled behind Mr. Stewart and turned on the emergency lights to his patrol vehicle. Mr. Stewart immediately pulled over.

32.    Loftin approached Mr. Stewart's vehicle on the driver's side and identified himself to Mr. Stewart using a false name. As Loftin approached, Mr. Stewart observed an unknown blonde woman sitting in the passenger seat of Loftin's patrol vehicle.

33.    Loftin told Mr. Stewart that he was being pulled over for driving 75 MPH in a 55 MPH zone. That was false. Mr. Stewart was not violating any laws at the time that he was pulled over by Loftin.

34.    Earlier that same day, in fact, Mr. Stewart had heard from friends (specifically, Ricky Patterson and Bobby Harvey), that RPSO officers had been targeting Black men, pulling them over, and justifying the stops by falsely accusing their Black targets of the exact same "violation" utilized by Loftin on November 7 against Mr. Stewart: driving 75 MPH in a 55 MPH zone. Thus, when Mr. Stewart was falsely accused by Loftin of the same "75 in a 55" violation, he told Loftin that he was "not going to fall for that gimmick."

35.    On information and belief, conducting pretextual traffic stops on the basis of race is such a pervasive policy, practice, and custom in the RPSO that it has become a *de facto* policy.

36.    When Loftin demanded to see his driver's license and proof of auto insurance, Mr. Stewart produced them and gave them to Loftin. Loftin walked to his patrol vehicle with the documents provided by Mr. Stewart, and then moments later returned to Mr. Stewart's vehicle to tell him that he had provided the wrong documents. Mr. Stewart disagreed and, indeed, the blonde woman in Loftin's patrol vehicle advised Loftin from the patrol car's loudspeaker that Mr. Stewart's license and insurance were both valid.

37.    When Loftin nevertheless continued to insist that Mr. Stewart had produced the

-8-

wrong documents, Mr. Stewart opened his glove compartment to search for any other documents that might satisfy Loftin's demands.

38.     As Mr. Stewart withdrew some papers from the glove compartment, Loftin began yelling, falsely, "Gun! You have a gun!" Loftin's contention had no basis in fact; Mr. Stewart did not have a gun nor any other object that even remotely resembled a gun. There was no gun anywhere in the vehicle.

39.     While yelling his falsehood about Mr. Stewart having a gun, Loftin simultaneously unholstered his service pistol and pointed it from less than a foot away directly at Mr. Stewart's face. Believing that Loftin intended to kill him, Mr. Stewart immediately and instinctively hit the gas pedal of his Suburban.[3] He drove straight to his nearby home, roughly a mile and a half from where he had been pulled over. *En route* to his home, Mr. Stewart called his wife asking her to go outside and wait for his arrival so that she could be a witness to Loftin's conduct, which he hoped would deter Loftin from murdering him.

**B.     After Handcuffing Mr. Stewart, Police Officers Then Beat and Tased Him for No Reason.**

40.     Mr. Stewart arrived at his home minutes later with Loftin right behind him. Mr. Stewart immediately exited the vehicle with his hands in the air. For several minutes, Loftin instructed Mr. Stewart to remain still with his hands in the air until additional law enforcement agents arrived. Mr. Stewart complied. Loftin pointed a gun at Mr. Stewart for that entire period. Several times during that period, Loftin assured Mr. Stewart he had "done nothing wrong," and acknowledged that he could tell Mr. Stewart was scared.

41.     Once other officers had arrived, Loftin instructed Mr. Stewart to walk backwards

---

[3] *See, e.g., Commonwealth v. Warren*, 58 N.E. 3d 333, 342 (Mass. 2016) (holding that where Black men are "disproportionately and repeatedly targeted" by law enforcement, flight from apprehension "add[s] nothing to the reasonable suspicion calculus" and is "totally unrelated to consciousness of guilt").

toward him. Mr. Stewart again did as he was instructed, and an officer placed Mr. Stewart in

handcuffs. As a Doe Officer was handcuffing Mr. Stewart, Loftin once again assured Mr. Stewart

that "[he] didn't do anything wrong; the only thing [he] did wrong was run." Shortly after being

handcuffed, several more police officers arrived at Mr. Stewart's home.

42.     While Mr. Stewart stood handcuffed by Loftin's patrol vehicle, officers conducted

their first illegal search of Mr. Stewart's Suburban. They claimed to be looking for a gun. Loftin

called out to Mr. Stewart's wife, who remained on the porch, and asked where Mr. Stewart had put

his gun. Mr. Stewart's wife replied that there was no gun; neither she nor Mr. Stewart own any guns.

43.     Upon Loftin's inability to locate a gun that never existed, Mr. Stewart perceived a

clear change in Loftin's attitude.

44.     Visibly frustrated, Loftin led Mr. Stewart, still handcuffed, to another patrol vehicle.

As he stood handcuffed beside the patrol vehicle, Mr. Stewart was then surrounded by four law

enforcement officers: Loftin, Morris, and two Doe Officers. Without any provocation or reason, the

four officers violently pushed Mr. Stewart's head to the ground, then pushed his handcuffed arms

into the air.

45.     The four officers then punched Mr. Stewart. Then, again without provocation or

reason, the officers tased Mr. Stewart. During this attack, one of the officers told Mr. Stewart: "You

know you fucked up, don't you?" Mr. Stewart cried out to his nearby wife in terror begging her,

"don't let them kill me."

46.     Mr. Stewart did nothing to provoke, justify, or warrant this physical assault.

Mr. Stewart did not pose a threat to anybody's safety at any time on the evening of November 7,

2020, and at no time after he arrived at his house did Mr. Stewart resist arrest or attempt to evade

arrest. Rather, he complied with the instructions he was given, the vast majority of which occurred

when his hands were restrained behind his back.

-10-

47.     Unable to adequately breathe and gasping for air, Mr. Stewart pleaded to the officers that he could not breath. He asked for his asthma inhaler. Loftin obtained the inhaler from Mr. Stewart's wife. He then offered it to Mr. Stewart, but then proceeded to take it away from him before he could get sufficient air into his lungs.

48.     After being beaten and still gasping for air, Mr. Stewart was placed into a patrol vehicle, which transported him to the Franklin Parish jail. During that drive, Mr. Stewart still could not adequately breathe and, as a result, lost consciousness while handcuffed in the patrol vehicle. A Doe Officer witnessed Mr. Stewart's loss of consciousness, evidenced by the fact that the Officer asked Mr. Stewart whether he was okay after he regained consciousness. Mr. Stewart informed the Doe Officer that he still could not breathe, that his handcuffs were on so tight that his fingers were numb, and that pain was radiating through his elbow. Consistent with the intentional maliciousness of the Defendants' actions throughout the evening, the Doe Officer responded by tightening the handcuffs, causing Mr. Stewart lasting pain. On information and belief, at no time while he was unconscious did any officer attempt to provide medical assistance or otherwise attempt to discern Mr. Stewart's medical status.

### C.     The Unlawful Conduct Inflicted on Mr. Stewart by the Louisiana State Police and Morris is Nearly Identical to the Excessive Force Inflicted by Them on Two Other Black Men.

49.     That Morris, a Louisiana State Trooper, participated in beating Mr. Stewart is noteworthy. Mere months ago, LSP Troopers made national news for unjustifiably attacking another Black man—Antonio Harris—at the border between Richland and Franklin Parishes. *See* Complaint, *Harris v. Brown, et al.*, Case No. 3:21-cv-01332-TAD-KDM (W.D. La. May 19, 2021). Mr. Harris was pulled over in Richland Parish by LSP Troopers. After being scared by those Troopers, Mr. Harris fled in his vehicle, until his vehicle was stopped in pursuit. Upon being stopped, Mr. Harris immediately exited his vehicle and surrendered to police by lying face down with his arms away from

his body and his legs spread apart. LSP Troopers then brutally beat Mr. Harris, and later boastfully

texted each other about how their beating would cause Mr. Harris "nightmares for a long time."[4]

50.     Mr. Harris sued the various officers, as well as RPSO Sheriff Gary Gilley and

Colonel Lamar Davis, Superintendent of LSP, in their individual and official capacities. *Id.* ¶ 4.

Defendant LSP Superintendent Davis, "with deliberate indifference to the rights of arrestees,

detainees, and the like, tolerated, permitted, failed to correct, promoted or ratified a number of

customs, patterns, or practices of their codefendants that failed to provide for the safety of arrestees,

detainees, and the like during arrest, including but not limited to during the handcuffing and restraint

process" *Id.* ¶ 80.

51.     On information and belief, Morris personally was involved in *another* racially

motivated LSP excessive force incident in 2019. In that case, too, a Black man named Morgan Blake

(whom Morris had pulled over) was thrown to the ground and beaten by Morris's colleagues, with

Morris standing nearby, after the Black suspect was already in handcuffs and not in any way resisting

arrest.[5]

52.     The LSP troopers involved in Mr. Stewart's beating, Mr. Harris's beating, and

Mr. Blake's beating were all members of an LSP troop named "Troop F." Troop F is a small but

notoriously violent division within the LSP that is currently under investigation for precisely the

conduct set forth in this Complaint: using excessive force against Black men.[6] In 2020, Troop F

made national news for killing Ronald Greene, another Black man who surrendered after a high-

---

[4] Timothy Bella, *State Troopers Texted About the "Whoopin" They Gave a Black Man, Record Show: "He's Gonna Have Nightmares,"* WASHINGTON POST (March 13, 2021, 4:29 PM),
https://www.washingtonpost.com/nation/2021/03/13/louisiana-police-black-man-text.
[5] Perry Robinson and Matthew Segura, *Details of July 2019 Incident that Led to LSP Excessive Force Arrest*, KALB (Feb 10, 2021, 4:47 PM), https://www.kalb.com/2021/02/11/details-of-july-2019-incident-that-led-to-lsp-excessive-force-arrest.
[6] Associated Press, *Louisiana Police Unit Probed Over Black Driver Arrests After Death of Ronald Greene*, NBC (June 10, 2021 7:18 AM), https://www.nbcnews.com/news/us-news/louisiana-police-unit-probed-over-black-driver-arrests-after-death-n1270283.

speed chase.[7] Mr. Greene was repeatedly tased, punched, choked, and beaten by four LSP troopers in Troop F until he was left facedown for several minutes and eventually died. The LSP then tried to cover-up their violent misconduct, falsely telling Mr. Greene's family that Mr. Greene had died upon impact after crashing his vehicle into a tree—a complete fabrication designed to conceal LSP's horrific conduct. More than a year would pass before LSP finally opened an internal investigation into Mr. Greene's murder.

53.     In fact, recently, on September 23, 2021, the United States Department of Justice indicted Jacob Brown, a former Trooper within the LSP's Troop F, for his assault of Aaron Bowman, also a Black man. In the course of arresting Mr. Bowman, after pulling him over for a routine traffic violation, Brown repeatedly struck Mr. Bowman in the head and body with a metal flashlight.[8] It was recently reported that, by 2015, Brown had racked up 23 use of force complaints, 19 of which were against Black people.[9]

54.     That LSP's Troop F routinely assaults unarmed, nonviolent Black men cannot be ignored or tolerated any longer. A recent whistleblower within the LSP, Mr. Carl Cavalier, confirmed that the LSP includes officers who act as "killers" and "people who are OK with the killers being on the job."[10] Mr. Cavalier also identified the scope of LSP's policy, practice, and custom, explaining he "couldn't go up the ladder because up the ladder is part of the problem. Up the ladder is some of

---

[7] Dan Levin and Michael Levenson, *What We Know About Ronald Greene's Death*, NY TIMES (June 11, 2021), https://www.nytimes.com/article/ronald-greene-video-louisiana.html.
[8] Press Release, Western District of Louisiana Department of Justice, Former Louisiana State Police Trooper Indicted on Civil Rights Charge for Assaulting Arrestee (Sept. 23, 2021), https://www.justice.gov/usao-wdla/pr/former-louisiana-state-police-trooper-indicted-civil-rights-charge-assaulting-arrestee.
[9] Jim Mustian & Jake Bleiberg, *In Louisiana, a Father, a Son and a Culture of Police Abuse*, AP NEWS (Oct. 26, 2021), https://apnews.com/article/business-louisiana-race-and-ethnicity-racial-injustice-baton-rouge-d2d50979a247c400746ba6703225f7ff.
[10] Derek Hawkins, *A Black State Trooper Spoke out About Police Brutality. Louisiana Police Want to Fire Him*, WASHINGTON POST (Oct. 14, 2021),  https://www.washingtonpost.com/nation/2021/10/14/louisiana-state-trooper-brutality.

155058993.1

the people perceived to be committing these criminal acts."[11] Dozens of current and former state troopers with the LSP have described "a culture of impunity, nepotism and in some cases outright racism."[12] In fact, 67% of LSP troopers' use of force targeted Black people in recent years, more than double the percentage of the Black population in Louisiana.[13]

55.     Defendant Davis has "acknowledged that the state police have lost the public's trust, due in part to an 'old-fashioned culture' in Louisiana's northern parishes in which some troopers are conditioned to punish anyone who runs from them or disrespects the badge."[14] On information and belief, Richland and Franklin Parishes are two such "northern parishes" where this "old-fashioned culture" has contributed to the LSP's *de facto* policy, practice, and custom to target Black men. In an example indicative of the widespread culture of racial profiling and racial violence against Black men, Lee Harrell, the former sheriff of the RPSO defended the placement of a Confederate flag in a former LSP trooper's office, commenting that no one objected to the flag because "it's history."[15]

56.     Mr. Stewart's experience in November 2020, as recounted in this Complaint, is not an isolated, atypical, or fantastical encounter. Rather, it is the unwritten policy, practice, and custom of the LSP to intentionally target Black men and violate their well-established rights by using unjustified and unwarranted physical force, as evidenced by numerous other well-documented accounts of unlawful treatment of Black men in the region by law enforcement. When an LSP officer dares to bring this policy, practice, and custom to light, he is silenced. For example, Mr. Cavalier was put on unpaid leave for five weeks and LSP recently moved to terminate Mr. Cavalier for violating policies, practices, and customs related to "loyalty with the department"

---

[11] *Id.*
[12] Mustian & Bleiberg, *supra* note 9.
[13] *Id.*
[14] *Id.*
[15] *Id.*

155058993.1

and "conduct unbecoming of an officer.[16] On information and belief, the known instances of LSP's unlawful treatment of Black men is but a fraction of those that have occurred, and that continue to occur.

**D.    The RPSO's Treatment of Mr. Stewart is Consistent with Their Pattern, Custom, and Informal Policy of Using Excessive Force Against Non-violent Suspects Who Have Already Been Handcuffed**

57.    Multiple lawsuits against RPSO show that RPSO has a long-established problem of employing excessive force against individuals that have been handcuffed and are not resisting arrest.

58.    In 2004, RPSO officers were transporting Joseph McNeese to jail. *McNeese v. Louisiana, Richland Parish Sheriff's Office*, No. 3:04-cv-00691-RGJ-JDK (W.D. La. June 15, 2004), ECF No. 8. During that drive, they threatened that once in jail, McNeese would be raped. *Id.* Upon arriving at the jail, RPSO officers removed the five-foot-one-inch and 130-pound McNeese from the patrol vehicle, with his arms handcuffed behind his back, and then—without provocation—pepper-sprayed and physically beat McNeese in the face and body. *Id.* McNeese required eight stitches in his face to aid his recovery from the attack. *Id.*

59.    In 2006, RPSO officers beat a man under the pretense of "arresting" him, despite the man being unarmed, not resisting arrest, and in no way threatening the arresting officers. *Wedgeworth v. McDonald et al.*, 3:07-cv-01490-RGJ-KLH (W.D. La. Sept. 7, 2007), ECF No. 1. Gilley was himself named in that lawsuit. *Id.* In another 2006 lawsuit, a man who was already handcuffed and in police custody was pepper-sprayed and then had his face slammed onto a counter by an RPSO officer who was merely upset by the plaintiff's request not to be stereotyped. *Morgan v. McDonald et al.*, 3:06-cv-00497-RGJ-KLH (W.D. La. Nov. 8, 2006), ECF No. 13.

60.    In another 2006 incident, Ronnie Vidrine admitted to doing drugs on a tree farm. *Vidrine v. Hamm, et al.*, 3:06-cv-01038-RGJ-KLH (W.D. La. July 25, 2006), ECF No. 7. As headlights

---

[16] Hawkins, *supra* note 10.

approached Vidrine, he began to run. *Id.* RPSO officers let loose a police dog to apprehend Vidrine and, as the dog was biting Vidrine's leg and impeding further movement, an RPSO officer shot Vidrine in the back. *Id.* Vidrine was then brutally beat in his face and head by an RPSO Deputy, who then handcuffed him behind his back. *Id.* Once handcuffed, the already shot, bitten, and beaten Vidrine was then beaten by an RPSO deputy again, necessitating emergency surgery at a local hospital. *Id.*

61.     These post-arrest excessive force incidents have not stopped in recent years. In November 2017, an RPSO officer got into an argument with Brian Hargiss over whether Hargiss had the legal authority to choose a treatment facility for Hargiss's own father. *Hargiss v. LaSalle Corrections, LLC, et al.*, 3:18-cv-01466-TAD-KDM (W.D. La. July 18, 2019), ECF No. 45. Inexplicably, the RPSO officer handcuffed Hargiss and then threw him against a table and then slammed his head into a police vehicle. *Id.* Once RPSO officers had taken Hargiss to the Richland Detention Center, they then repeatedly beat Hargiss without provocation. *Id.* While physically restrained, Hargiss was beat in the head, fracturing his skull. He was then stripped naked, strapped to a chair, placed in a cold shower, and then physically beat again. *Id.*

62.     On information and belief, based on publicly available information, RPSO has not disciplined or decertified any of its officers for employing excessive force in the cases identified above nor in any other publicly known case.

## E.     Defendants Falsified Documents Associated with Mr. Stewart's Arrest and Detention.

63.     Once Mr. Stewart had been unjustifiably taken to the Franklin Parish jail, other Doe Officers and Loftin remained at Mr. Stewart's home. These Doe Officers searched Mr. Stewart's vehicle again, for a long period of time, claiming to be looking for a gun in the vehicle. Neither Mr. Stewart nor his wife consented to any search, and no officer sought consent from either of

them. No gun was ever found, as Mr. Stewart does not own a gun nor keep a gun in his vehicle.

64.     In addition to performing an unconstitutional search, the Doe Officers and Loftin ultimately planted evidence in Mr. Stewart's vehicle to "justify" their conduct that night. Specifically, Mr. Stewart had a full and unopened bottle of Coors Light in a cooler (along with water and Gatorade) in the backseat of his Suburban. On information and belief, Loftin and/or one of the Doe Officers removed that bottle from the cooler, opened it, removed beer from the bottle, placed the bottle in the front seat cupholders, and then photographed it as "evidence" to support a fraudulent DWI charge. A DWI charge had never so much as been mentioned as a basis for stopping, arresting, or searching Mr. Stewart. In fact, Mr. Stewart was not made aware that he had been arrested for, or charged with, a DWI until days after his arrest, when he reviewed the paperwork related to securing a bond.

65.     Loftin and the Doe Officers similarly planted an unknown substance in Mr. Stewart's vehicle. Mr. Stewart had several prescription pill bottles in his car, all belonging to Mr. Stewart's wife who suffers a significant and life-altering medical condition necessitating numerous prescriptions.

66.     On information and belief, Loftin and Doe Officers placed an unknown material (purportedly marijuana) into one of those pill bottles and then photographed it, again as "evidence" to support a fraudulent possession charge. This was another false charge never mentioned as a basis for unlawfully stopping and arresting Mr. Stewart, or searching his vehicle, until days later, when Mr. Stewart was provided paperwork associated with his bail.

67.     The two lengthy searches of the car on the Stewarts' property provided Defendants ample additional opportunity to stage and plant evidence in Mr. Stewart's Suburban. Moreover, Defendants had an unknown period of time with the Suburban after Mr. Stewart's arrest, as they impounded and held the car in their custody.

68.     After searching the automobile Mr. Stewart had been driving, the Doe Officers then

inexplicably and without justification attempted to search other vehicles on Mr. Stewart's premises. Their unlawful efforts were unsuccessful as the vehicles were locked.

69.     As he arrived at the Franklin Parish jail, Morris asked Mr. Stewart to undergo a field sobriety test. Morris did not tell him why. No officer ever told Mr. Stewart that he had been arrested for driving under the influence of alcohol. Mr. Stewart passed each of the sobriety tests—because he had not been drinking—except that Mr. Stewart could not stand on his right leg alone; Mr. Stewart had previously undergone a total knee replacement in his right leg. Standing on his right leg alone is very difficult for Mr. Stewart. Notwithstanding these facts, Morris falsified the field sobriety report, misrepresenting the results by indicating that Mr. Stewart had failed every test Morris had given him.

70.     Mr. Stewart also expressly consented to a breathalyzer test. Morris attempted to conduct the test, but the test was inconclusive due to the beatings and terror to which he had been subjected. Mr. Stewart had not recovered his full breath and did not have enough air in his lungs for the test to properly function. Mr. Stewart requested he be allowed to use his asthma inhaler before again attempting to breathe into the equipment. But Morris refused Mr. Stewart's request. Then, instead of accurately recording that Defendants had refused Mr. Stewart the means necessary for him to intake sufficient oxygen to take the breathalyzer test, Morris falsely recorded on official documents that Mr. Stewart had refused to take the test.

71.     Mr. Stewart was then formally taken into custody by RPSO police officers, who falsely noted in their own arrest report that Mr. Stewart had "refused to give a proper sample" as to the breathalyzer test administered at the Franklin Parish jail. Mr. Stewart was then held in the Richland Parish Detention Center for almost a week until bond was posted.

72.     Neither at the time of his arrest nor at any point during his detention was Mr. Stewart notified of his *Miranda* rights. Mr. Stewart was similarly never notified at any time during his detention of why he had been arrested, why he was being detained, or what crimes he was being

-18-

charged with committing. Notwithstanding, discovery in connection with Mr. Stewart's criminal proceedings revealed a "Statement of Rights" purported to have been signed by Mr. Stewart.[17] The "Statement of Rights" does not include Mr. Stewart's real signature. On information and belief, the signature on that document was forged by law enforcement personnel.

73. The LSP has a demonstratable history of promoting and tolerating its officers' falsification and concealment of evidence. After their aforementioned beating of Antonio Harris, for instance, LSP troopers produced "wholly untrue" reports alleging that Harris had resisted arrest.[18] And, as previously alleged, after LSP troopers beat Ronald Greene to death, they concealed their actions by informing Mr. Greene's family that Mr. Greene had died by crashing his vehicle into a tree.[19]

### F.      Mr. Stewart Suffered Significant and Lasting Harm and has Continued Medical Issues and Emotional Distress.

74. Defendants' unconstitutional and tortious conduct has caused Mr. Stewart several significant and lasting harms. From the physical beating and excessively tightened handcuffs, Mr. Stewart suffered arm and hand injuries that left him sore for several weeks. Mr. Stewart also has scarring on his skin as a result of Defendants' excessive use of a taser.

75. Since the events that occurred on November 7 and 8, 2020, and as a result of those events, Mr. Stewart has been diagnosed with Post-Traumatic Stress Disorder (PTSD) and suffered at least one anxiety attack to date. Mr. Stewart has been prescribed and is being required to pay for Paroxetine in an attempt to treat his PTSD.

76. All of the above-described acts were done by the Defendants' intentionally,

---

[17] Attached as Exhibit A.
[18] Associated Press, *Louisiana Police Unit Probed Over Black Driver Arrests After Death of Ronald Greene*, NBC (June 10, 2021 7:18 AM), https://www.nbcnews.com/news/us-news/louisiana-police-unit-probed-over-black-driver-arrests-after-death-n1270283.
[19] Dan Levin and Michael Levenson, *What We Know About Ronald Greene's Death*, NY TIMES (June 11, 2021), https://www.nytimes.com/article/ronald-greene-video-louisiana.html.

knowingly, willfully, wantonly, maliciously and/or recklessly in disregard for Mr. Stewart's federally and state protected rights, and were done while acting under color of state law.

77.     On information and belief, certain Defendant police officers may also have a history of citizen complaints and/or discipline.

78.     As a direct and proximate result of the wrongful conduct in which each of the Defendants engaged, Mr. Stewart has been substantially injured. Mr. Stewart's injuries include, but are not limited to, loss of federal and state constitutional rights, physical injuries, impairments, scarring, great pain and emotional distress.

79.     Mr Stewart continues to suffer ongoing emotional distress, has been diagnosed with PTSD, and suffers from anxiety, stress, anger, and frustration from being mistreated by law enforcement. Mr. Stewart also suffered significant financial damage resulting from the falsified charges against him. For instance, in order to retain his driver's license, Mr. Stewart was required to pay for the installation of an ignition interlock on his vehicle. Worse, Mr. Stewart previously made a living as a professional driver, necessitating a Louisiana Chauffeur License. The manufactured charges, as detailed herein, resulted in a suspension of the Chauffeur License such that Mr. Stewart has been stripped of his primary source of income.

### G.     Mr. Stewart's Public Records Requests.

80.     Mr Stewart, through his undersigned counsel, submitted public records requests under the Louisiana Public Records Act ("LPRA") for (1) more information about the circumstances of Mr. Stewart's arrest and (2) for certain RPSO data to obtain further evidence for this action. Mr. Stewart sent the former request on March 2, 2021 and the latter on September 29, 2021. The latter September 29, 2021 LPRA request sought:

- All complaints received from January 1, 2011 to the present that allege excessive use of force committed by any officer within the Richland Parish Sheriff's Office.

-20-

- All complaints received from January 1, 2011 to the present that allege assault or unwanted physical contact committed by any officer within the Richland Parish Sheriff's Office.

- All complaints received that allege excessive use of force committed by Caleb Loftin.

- All complaints received that allege assault or unwanted physical contact committed by Caleb Loftin.

- All personnel and disciplinary records associated with Caleb Loftin.

- Any internal analyses containing demographic statistics associated with the use of force by the Richland Parish Sheriff's Office.

- Documents sufficient to identify each instance that an officer within Richland Sheriff's Police Office used a taser against a member of the public from January 1, 2011 to the present.

81.     Although RPSO provided documents in response to Mr. Stewart's first records request, it failed to provide any response or produce any documents whatsoever to Mr. Stewart's September 29, 2021 LPRA request. To date, Mr. Stewart has still not received any written response from RPSO or any responsive documents regarding this second request.

82.     On information and belief, this is not RPSO's first time simply ignoring a LPRA request regarding its policing data. In July of 2020, MuckRock, a non-profit news site that provides a repository of government materials in an effort to make citizens more informed and government policies more transparent, sent a LPRA request to RPSO requesting information regarding use of force incidents, civilian complaints for law enforcement misconduct, civilian complaints for use of excessive force, and civilian complaints alleging biased policing or racial profiling. MuckRock's website[20] shows multiple emails following up with RPSO, with no response or even acknowledgment. As recently as November 29, 2021, MuckRock has continued to seek the

---

[20] *Police Data Collection Project (Richland Parish Sheriff's Office)*, MUCKROCK, https://www.muckrock.com/foi/richland-county-16109/police-data-collection-project-richland-parish-sheriffs-office-97788 (last visited December 13, 2021).

155058993.1

requested records and RPSO has apparently continued to ignore its duties under the Louisiana Public Records law.

## V.    CAUSE OF ACTION 1

### Violation of 42 U.S.C. § 1983

### Excessive Force – Fourth and Fourteenth Amendments

### (Defendants Loftin, Morris, Doe Officers 1-5, Doe Insurance Companies 1-10)

83.    Mr. Stewart repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

84.    Defendants Loftin, Morris, and Doe Officers 1-5 deployed objectively unreasonable force against Mr. Stewart after he was handcuffed. Specifically—after Mr. Stewart had already repeatedly and compliantly followed all instructions by law enforcement, was handcuffed, and had not in any manner resisted apprehension—Defendants physically punched, beat, and tased Mr. Stewart on his own property in front of his wife. A Doe Officer used additional excessive force in tightening the handcuffs restraining Mr. Stewart after Mr. Stewart advised that the handcuffs had cut off blood circulation to his hands and were radiating pain up through his elbow.

85.    At the time that those officers used excessive force on Mr. Stewart, there were no factual circumstances that would have led a reasonable person to believe that Mr. Stewart posed any threat to any person, or that any force was required to effectuate Mr. Stewart's arrest or transport him to jail. Those officers' use of force was patently excessive and objectively unreasonable.

86.    Defendants' excessive use of force on Mr. Stewart directly and proximately caused compensable injury to Mr. Stewart.

87.    On information and belief, Doe Insurance Companies 1-10 have issued and/or currently have in effect one or more policies of insurance covering Defendants and the actions alleged herein and are jointly and severally liable for any and all damages arising from the injuries

suffered by Mr. Stewart.

## VI.     CAUSE OF ACTION 2

### Violation of 42 U.S.C. § 1983

### Deliberate Indifference to Medical Needs - Fourteenth Amendment

### (Defendants Loftin, Morris, Doe Officers 1-5, Doe Insurance Companies 1-10)

88.     Mr. Stewart repeats and re-alleges the allegations set forth in the preceding

paragraphs of the Complaint as though fully set forth herein.

89.     Defendants Loftin, Morris, and Doe Officers 1-5 exhibited deliberate indifference to

Mr. Stewart's serious medical needs, as specifically alleged above, in violation of Mr. Stewart's

Fourteenth Amendment rights. Those Defendants were aware or should have been aware that

Mr. Stewart was asthmatic, in need of his inhaler, and requiring immediate medical attention during

and after those Defendants' assault of Mr. Stewart. Mr. Stewart complained that he could not

breathe, displayed obvious symptoms of respiratory distress, and lost consciousness.

90.     Despite Mr. Stewart's obvious need for medical assistance, those Defendants did not

attempt to obtain it for him, nor did they make any effort to assess his medical status or render aid

to him, despite a well-established duty to do so.

91.     The failure of those Defendants to obtain medical assistance for Mr. Stewart in

response to his need for medical assistance constituted deliberate indifference to Mr. Stewart's

serious medical needs.

92.     Those Defendants' deliberate indifference to those needs directly and proximately

caused compensable injury to Mr. Stewart.

93.     On information and belief, Doe Insurance Companies 1-10 have issued and/or

currently have in effect one or more policies of insurance covering Loftin, Morris, and/or Doe

Officers 1-5 and the actions alleged herein and are jointly and severally liable for any and all damages

-23-

arising from the injuries suffered by Mr. Stewart.

## VII.    CAUSE OF ACTION 3

### Violation of 42 U.S.C. § 1983

### Failure to Intervene in Use of Excessive Force – Fourth and Fourteenth Amendments

### (Defendants Loftin, Morris, Doe Officers 1-5, Doe Insurance Companies 1-10)

94.    Mr. Stewart repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

95.    Each of the Defendants present during Mr. Stewart's beating and excessive force used by their colleagues against Mr. Stewart and had ample time to intervene in order to prevent or mitigate injury to him.

96.    Any reasonable police officer in the position of the Defendants would have recognized that the force being used against Mr. Stewart was unconstitutionally excessive and would have known that they had a duty to take reasonable measures to prevent harm to Mr. Stewart.

97.    Defendants failed to take any action to prevent harm to Mr. Stewart and thereby proximately caused unconstitutionally excessive force to be inflicted upon Mr. Stewart. That unconstitutional force resulted in grave physical injuries and psychiatric distress to Mr. Stewart.

98.    In depriving Mr. Stewart of his rights under the United States Constitution, the Defendants acted under color of law in their respective capacities as LSP and RPSO officers, and their actions and omissions were conducted within the scope of their respective official duties or employment. This deprivation under color of law is actionable under, and may be redressed by, 42 U.S.C. § 1983.

99.    On information and belief, Doe Insurance Companies 1-10 have issued and/or currently have in effect one or more policies of insurance covering Loftin, Morris and/or Doe Officers 1-5 and the actions alleged herein and are jointly and severally liable for any and all damages

arising from the injuries suffered by Mr. Stewart.

## VIII.   CAUSE OF ACTION 4

### Battery

### (Defendants Loftin, Morris, Gilley, Doe Officers 1-5, Doe Insurance Companies 1-10)

100.    Mr. Stewart repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

101.    Defendants Loftin, Morris, and Doe Officers 1-5 intentionally and harmfully made physical contact with Mr. Stewart after they had already placed him in handcuffs and while he was not in any manner a threat or resisting. Specifically, they punched him, beat him, and tased him unreasonably. Each of those Defendants intended to cause Mr. Stewart harm.

102.    Defendants' battery directly injured Mr. Stewart and Mr. Stewart was harmed as a result of the contact.

103.    Defendant Loftin is an employee of RPSO. His battery was so closely connected in time, place, and causation to his employment duties so as to be regarded as a risk of harm attributable to RPSO. Thus, Defendant Gilley is liable for the battery committed by Loftin under the theory of *respondeat superior*.

104.    On information and belief, Doe Insurance Companies 1-10 have issued and/or currently have in effect one or more policies of insurance covering Loftin, Morris and/or Doe Officers 1-5 and the actions alleged herein and are jointly and severally liable for any and all damages arising from the injuries suffered by Mr. Stewart.

## IX.    CAUSE OF ACTION 5

### Assault

### (Defendants Loftin, Morris, Gilley, Doe Officers 1-5, Doe Insurance Companies 1-10)

105.    Mr. Stewart repeats and re-alleges the allegations set forth in the preceding

-25-

paragraphs of the Complaint as though fully set forth herein.

106.    As explained above, Defendants Loftin, Morris, and Doe Officers 1-5 intentionally and harmfully made physical contact with Mr. Stewart after they had already placed him in handcuffs and while he was not in any manner a threat or resisting. Specifically, they punched him, beat him, and tased him unreasonably. Each of those defendants intended to cause Mr. Stewart harm.

107.    Defendants Loftin, Morris, and Doe Officers 1-5 assaulted Mr. Stewart by threatening to cause imminent harmful contact with him. Beyond the imminent threat to commit the batteries above, Defendant Loftin in fact assaulted Mr. Stewart by unreasonably pointing a gun at Mr. Stewart on multiple occasions and threatening to shoot him when Mr. Stewart presented no danger to Loftin or anyone else.

108.    Defendants' assault directly and proximately caused compensable injury to him.

109.    Defendant Loftin is an employee of RPSO. His assault was so closely connected in time, place, and causation to his employment duties so as to be regarded as a risk of harm attributable to RPSO. Thus, Defendant Gilley is liable for the assault committed by Loftin under the theory of *respondeat superior*.

110.    On information and belief, Doe Insurance Companies 1-10 have issued and/or currently have in effect one or more policies of insurance covering Loftin, Morris and/or Doe Officers 1-5 and the actions alleged herein and are jointly and severally liable for any and all damages arising from the injuries suffered by Mr. Stewart.

## X.    CAUSE OF ACTION 6

### Intentional Infliction of Emotional Distress

### (Defendants Loftin, Morris, Gilley, Doe Officers 1-5, Doe Insurance Companies 1-10)

111.    Mr. Stewart repeats and re-alleges the allegations set forth in the preceding

-26-

paragraphs of the Complaint as though fully set forth herein.

112.    Mr. Stewart asserts violations of Louisiana law relative to intentional torts by Defendants Loftin, Morris, and Doe Officers 1-5, all of whom were acting within the course and scope of their employment with the LSP and RSPO. At all relevant times, Defendants were acting under the color of state law.

113.    The acts or omissions of these Defendants, as described herein, deprived Mr. Stewart of his constitutional rights and caused him other damages.

114.    As a direct and proximate result of the intentional acts of the Defendants described herein, carried out in reckless disregard, falsity and/or without sufficient factual information, Mr. Stewart suffered economic damage including loss of gainful employment, was caused physical injury, psychiatric distress, and continues to suffer from PTSD, distress, anguish, sorrow, depression and loss of enjoyment of life.

115.    The aforesaid physical and psychological injuries sustained by Mr. Stewart were caused wholly by reason of the intentional, reckless, and/or negligent acts of the Defendants as described herein.

116.    The Defendants engaged in extreme and outrageous conduct, and acted maliciously and with specific intent to oppress and harm Mr. Stewart and/or with reckless disregard of the consequences of their actions and omissions, and as a result Mr. Stewart is entitled to damages in an amount to be proven at trial.

117.    Defendant Loftin is an employee of RPSO. His infliction of emotional distress was so closely connected in time, place, and causation to his employment duties so as to be regarded as a risk of harm attributable to RPSO. Thus, Defendant Gilley is liable for the intentional infliction of emotional distress committed by Loftin under the theory of *respondeat superior*.

118.    On information and belief, Doe Insurance Companies 1-10 have issued and/or

currently have in effect one or more policies of insurance covering Loftin, Morris and/or Doe

Officers 1-5 and the actions alleged herein and are jointly and severally liable for any and all damages

arising from the injuries suffered by Mr. Stewart.

### XI.      CAUSE OF ACTION 7

**Violation of 42 U.S.C. § 1983**

***Monell* Liability – Pretextual Seizures**

**(Defendants Gilley, Doe Insurance Companies 1-10)**

119.      Mr. Stewart repeats and re-alleges the allegations set forth in the preceding

paragraphs of the Complaint as though fully set forth herein.

120.      The actions of Loftin in seizing Mr. Stewart violated Mr. Stewart's rights as

guaranteed by the Fourth and Fourteenth Amendments, as alleged above.

121.      Loftin and Gilley (along with Doe Insurance Companies 1-10), acting together and

under color of law, engaged in a course of conduct and otherwise conspired among themselves to

commit those acts described herein and to deprive Mr. Stewart of his constitutional rights as set

forth herein.

122.      Gilley had the power to prevent or aid in the prevention of the wrongs done and

conspired to be done as described herein yet failed or refused to do so in violation of 42 U.S.C.

§ 1983.

123.      The RPSO (through Gilley) has developed and maintained formal or informal

policies, practices, and customs exhibiting deliberate indifference to the constitutional rights of

individuals in Richland Parish, which caused the violation of Mr. Stewart's rights, as described

herein, and the resultant damages suffered. These policies, practices, and customs include:

    i.    Failing to properly train, supervise, or discipline police officers and supervisors regarding
          constitutional traffic stops; and

ii. Contributing to the development of, or otherwise failing to stop, a racially-motivated municipal-wide policy, practice, and custom of seizing individuals under false pretenses—chiefly, claiming that the stopped individuals were speeding when they were not.

124.    Given the repeated unconstitutional searches and seizures described above, Gilley and RPSO were on notice that the behavior of several of their deputies violated Mr. Stewart's constitutional rights. Still, Gilley and RPSO did not discipline or decertify any of their deputies, continuing a longstanding pattern or policy of failing to decertify officers who evade constitutional requirements.[21] More to the point, on information and belief, Louisiana has not decertified a single officer for misconduct in the past decade.[22] On information and belief, this is because local Sheriffs, like Gilley and RPSO, "have failed to request decertifications" of even law enforcement officers whom they know to be problematic.[23]

125.    RPSO and Gilley's acts and omissions as described herein were done with deliberate indifference to Mr. Stewart's constitutional rights. Such acts and omissions were the moving forces behind the violations of Mr. Stewart's constitutional rights. RPSO acted maliciously, willfully, wantonly, and in reckless disregard of Mr. Stewart's rights.

126.    RPSO's policy, practice, and custom of seizing Black drivers under false pretenses violates the equal protection clause of the Fourteenth Amendment. On information and belief,

---

[21] Kimbriell Kelly, et al., *Forced Out Over Sex, Drugs and Other Infractions, Fired Officers Find Work in Other Departments*, WASH. POST (Dec. 28, 2017), https://www.washingtonpost.com/investigations/forced-out-over-sex-drugs-or-child-abuse-fired-officers-find-work-in-other-departments/2017/12/22/e0512774-d3a7-11e7-95bf-df7c19270879_story.html?tid=ss_mail ("But Louisiana has not decertified a single officer for misconduct in the past decade, records show. State officials said that local departments have failed to request decertifications. Local police officials said, however, that the process of decertifying an officer they no longer employ can be laborious and may not be worth the time.").
[22] *Id.*
[23] *Id.*

RPSO is motivated by racial discrimination in developing and applying that policy, practice, and custom. On information and belief, RPSO treats Black drivers differently than they would white drivers, and that different treatment stems from RPSO's discriminatory intent.

127.    Defendants' actions toward Mr. Stewart directly and proximately caused compensable injury to him.

128.    On information and belief, Doe Insurance Companies 1-10 have issued and/or currently have in effect one or more policies of insurance covering RPSO and/or Gilley and the actions alleged herein and are jointly and severally liable for any and all damages arising from the injuries suffered by Mr. Stewart.

## XII.    CAUSE OF ACTION 8
### Violation of 42 U.S.C. § 1983
### *Monell* Liability - Excessive Force – Fourth, Eighth, and Fourteenth Amendments
### (Defendants Gilley, Doe Insurance Companies 1-10)

129.    Mr. Stewart repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

130.    Defendants Loftin and Doe Officers 1-5 deployed objectively unreasonable force against Mr. Stewart after Loftin had already placed Mr. Stewart in handcuffs. Specifically—after demonstrating compliance and while he was already handcuffed and not in any way resisting apprehension—those Defendants physically punched, beat, and tased Mr. Stewart on his own property. A Doe Officer also unnecessarily used excessive force in tightening the handcuffs restraining Mr. Stewart, essentially retaliating after Mr. Stewart advised that the handcuffs had cut off blood circulation to his hands and were radiating pain up through his elbow.

131.    At the time that those officers used excessive force on Mr. Stewart, there were no factual circumstances that would have led a reasonable person to believe that Mr. Stewart posed any

-30-

threat to any person, or that any force was required to effectuate Mr. Stewart's arrest or transport to jail. Those officers' use of force was patently excessive to any need, and that excessiveness was objectively unreasonable.

132.    The RPSO (through Gilley) has developed and maintained formal or informal policies, practices, and customs exhibiting deliberate indifference to the constitutional rights of individuals in Richland Parish, which caused violations of Mr. Stewart's rights, as described herein, and the resultant damages suffered. These policies, practices and customs include the following:

i) Failing to properly screen before hiring and failing to properly supervise, discipline, train or control police officers and supervisors under its jurisdiction and control, including the defendant officers, supervisors, and commanders;

ii) Failing to provide adequate or reasonable supervision, discipline, monitoring or control of officers, including of the specifically named individual defendants herein;

iii) Failing to take reasonable and necessary steps to properly investigate, charge, maintain, or defend disciplinary action for misconduct against officers or supervisors;

iv) Failing to take appropriate remedial action for officers believed to have previously used excessive force;

v) Failing to properly train, supervise, or discipline police officers and supervisors regarding the appropriate use of force;

vi) Condoning, approving, or authorizing a culture and environment within the RPSO in which personnel, including the individual defendants named herein, had the reasonable belief or expectation that their actions would not be properly monitored by supervisory officers and that their misconduct would not be thoroughly investigated or sanctioned and would instead be tolerated; and

vii) Contributing to the development of, or otherwise failing to stop, a racially-motivated municipal-wide policy, practice, and custom of using excessive force against Black citizens.

133.    Given the repeated and unjustified uses of excessive force described above, Gilley and RPSO were on notice that the behavior of several of their deputies violated Mr. Stewart's constitutional rights. Still, Gilley and RPSO did not discipline or decertify any of their deputies, continuing a longstanding pattern or policy of failing to decertify officers who evade constitutional requirements.[24]   More to the point, on information and belief, Louisiana has not decertified a single officer for misconduct in the past decade.[25] On information and belief, this is because local Sheriffs, like Gilley and RPSO, "have failed to request decertifications" of even law enforcement officers whom they know to be problematic.[26]

134.    RPSO's acts and omissions as described herein were done with deliberate indifference to Mr. Stewart's constitutional rights. Such acts and omissions were the moving forces behind the violations of Mr. Stewart's constitutional rights. RPSO acted maliciously, willfully, wantonly, and in reckless disregard of Mr. Stewart's rights.

135.    RPSO's acts and omissions directly and proximately caused compensable injury to Mr. Stewart.

136.    On information and belief, Doe Insurance Companies 1-10 have issued and/or currently have in effect one or more policies of insurance covering RPSO and/or Gilley and the actions alleged herein and are jointly and severally liable for any and all damages arising from the injuries suffered by Mr. Stewart.

---

[24] *See id.*
[25] *Id.*
[26] *Id.*

### XIII.   CAUSE OF ACTION 9

### Declaratory Judgment

### *Monell* Liability - Excessive Force – Fourth, Eighth, and Fourteenth Amendments

### (Defendant Davis)

137.    Mr. Stewart repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

138.    Defendants Loftin, Morris, and Doe Officers 1-5 deployed objectively unreasonable force against Mr. Stewart after Loftin had already placed Mr. Stewart in handcuffs. Specifically— after demonstrating compliance and while he was already handcuffed and not in any way resisting apprehension—those Defendants physically punched, beat, and tased Mr. Stewart on his own property. A Doe Officer also unnecessarily used excessive force in tightening the handcuffs restraining Mr. Stewart, essentially retaliating after Mr. Stewart advised that the handcuffs had cut off blood circulation to his hands and were radiating pain up through his elbow.

139.    At the time that those officers used excessive force on Mr. Stewart, there were no factual circumstances that would have led a reasonable person to believe that Mr. Stewart posed any threat to any person, or that any force was required to effectuate Mr. Stewart's arrest or transport to jail. Those officers' use of force was patently excessive to any need, and that excessiveness was objectively unreasonable.

140.    The LSP have a demonstrable history of using excessive force against Black men. In addition to Morris's participation in assaulting Mr. Stewart, the LSP's predilection for racial violence has been exposed through their 2019 killing of Ronald Greene and their brutal 2020 assault of Antonio Harris.

141.    The LSP (through Davis) have developed and maintained formal or informal policies, practices, and customs exhibiting deliberate indifference to the constitutional rights of

-33-

individuals in Louisiana, which caused violations of Mr. Stewart's rights, as described herein, and the resultant damages suffered. These policies, practices and customs include the following:

i) Failing to properly screen before hiring and failing to properly supervise, discipline, train or control police officers and supervisors under its jurisdiction and control, including the defendant officers, supervisors, and commanders;

ii) Failing to provide adequate or reasonable supervision, discipline, monitoring or control of officers, including of the specifically named individual defendants herein;

iii) Failing to take reasonable and necessary steps to properly investigate, charge, maintain, or defend disciplinary action for misconduct against officers or supervisors;

iv) Failing to take appropriate remedial action for officers believed to have previously used excessive force;

v) Failing to properly train, supervise, or discipline police officers and supervisors regarding the appropriate use of force;

vi) Condoning, approving, or authorizing a culture and environment within the LSP in which personnel, including the individual defendants named herein, had the reasonable belief or expectation that their actions would not be properly monitored by supervisory officers and that their misconduct would not be thoroughly investigated or sanctioned and would instead be tolerated; and

vii) Contributing to the development of, or otherwise failing to stop, a racially-motivated municipal-wide policy, practice, and custom of using excessive force against Black citizens within Louisiana.

142.     LSP's acts and omissions as described herein were done with deliberate indifference to Mr. Stewart's constitutional rights. LSP acted maliciously, willfully, wantonly, and in reckless disregard of Mr. Stewart's rights.

143.     Mr. Stewart therefore seeks a declaration under 28 U.S.C. § 2201 that the conduct of the LSP (through Davis), as alleged herein, violated Mr. Stewart's rights under the Fourth, Eighth,

and/or Fourteenth Amendments. There is an actual controversy within this Court's jurisdiction between Mr. Stewart and Davis regarding the deprivation of Mr. Stewart's rights.

## XIV.   CAUSE OF ACTION 10
### Violation of 42 U.S.C. § 1983
### Unreasonable Seizure (Traffic Stop) – Fourth and Fourteenth Amendments
### (Defendants Loftin, Doe Insurance Companies 1-10)

144.    Mr. Stewart repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

145.    Defendant Loftin seized Mr. Stewart using force and words a reasonable person would be afraid to ignore by pulling over Mr. Stewart using the sirens and flashing lights on Loftin's police vehicle, and then by pulling a firearm on Mr. Stewart.

146.    At the time Defendant Loftin seized him, Mr. Stewart had clearly established rights under the Fourth and Fourteenth Amendments to be free from unreasonable search and seizure.

147.    Defendant Loftin's seizure of Mr. Stewart was objectively unreasonable, because of the facts and circumstances complained of herein, including that Mr. Stewart was not violating any laws at the time of his seizure. Instead, Loftin stopped Mr. Stewart for nothing more than his race.

148.    Defendant Loftin's seizure of Mr. Stewart directly and proximately caused compensable injury to him.

149.    On information and belief, Doe Insurance Companies 1-10 have issued and/or currently have in effect one or more policies of insurance covering Loftin and his actions alleged herein and are jointly and severally liable for any and all damages arising from the injuries suffered by Mr. Stewart.

## XV.    CAUSE OF ACTION 11

### Violation of 42 U.S.C. § 1983

### Illegal Search – Fourth and Fourteenth Amendments

### (Defendants Loftin, Doe Officers 1-5, Doe Insurance Companies 1-10)

150.    Mr. Stewart repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

151.    Loftin and Doe Officers 1-5 unlawfully searched Mr. Stewart's vehicle, as specifically alleged above, in violation of Mr. Stewart's Fourth and Fourteenth Amendment rights. Loftin and Doe Officers 1-5 first unlawfully searched Mr. Stewart's vehicle shortly after handcuffing Mr. Stewart, while Mr. Stewart stood by Loftin's patrol vehicle. Doe Officers 1-5 then unlawfully searched Mr. Stewart's vehicle again, after Mr. Stewart had been removed from his property.

152.    Both searches of his vehicle were illegal because: (1) his arrest was illegal; (2) they were conducted after Mr. Stewart had been arrested and detained (and the second search conducted after he had even been removed from his property altogether); and/or (3) they were conducted without a search warrant, on his property.

153.    Neither Mr. Stewart nor his wife consented to either search. No exigent circumstance justified either search of the vehicle.

154.    The unlawful searches of Mr. Stewart's property directly and proximately caused compensable injury to him.

155.    On information and belief, Doe Insurance Companies 1-10 have issued and/or currently have in effect one or more policies of insurance covering Loftin and Doe Officers 1-5 and the actions alleged herein and are jointly and severally liable for any and all damages arising from the injuries suffered by Mr. Stewart.

155058993.1

## XVI.   CAUSE OF ACTION 12

### Violation of 42 U.S.C. § 1983

### Due Process Violation – Falsification of Evidence

### (Defendant Doe Officers 1-5, Doe Insurance Companies 1-10)

156.    Mr. Stewart repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

157.    As previously alleged, Mr. Stewart was charged with possession of marijuana and of driving under the influence based in part upon alleged marijuana planted in his vehicle and a beer bottle taken from the rear of the vehicle, opened, and staged for photograph in the front cupholder. Doe Officers 1-5 falsely planted that "evidence" and thereby deprived Mr. Stewart of his procedural due process rights under the Fourteenth Amendment of the U.S. Constitution.

158.    Morris's actions toward Mr. Stewart directly and proximately caused compensable injury to him.

159.    On information and belief, Doe Insurance Companies 1-10 have issued and/or currently have in effect one or more policies of insurance covering Morris and his actions alleged herein and are jointly and severally liable for any and all damages arising from the injuries suffered by Mr. Stewart.

## XVII.  CAUSE OF ACTION 13

### Violation of 42 U.S.C. § 1983

### Due Process Violation – Falsification of Arrest Records

### (Defendants Morris, Doe Insurance Companies 1-10)

160.    Mr. Stewart repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

161.    As previously alleged, Mr. Stewart was charged with driving under the influence in

part or in whole because of a document that falsely reflected that he "refused" a breathalyzer test. To the contrary, as explained above, Mr. Stewart consented to a breathalyzer test but lacked sufficient air in his lungs to complete the test as a result of the Defendants' attacking him and then refusing to provide him reasonable access to his inhaler. On information and belief, it was Morris who falsely noted Mr. Stewart's "refusal" to complete the breathalyzer test on police records.

162.    Morris's falsification of the breathalyzer incident deprived Mr. Stewart of his procedural due process rights under the Fourteenth Amendment of the U.S. Constitution.

163.    Morris's actions toward Mr. Stewart directly and proximately caused compensable injury to him.

164.    On information and belief, Doe Insurance Companies 1-10 have issued and/or currently have in effect one or more policies of insurance covering Morris and his actions alleged herein and are jointly and severally liable for any and all damages arising from the injuries suffered by Mr. Stewart.

### XVIII. CAUSE OF ACTION 14
### Declaratory Judgment
### *Monell* Liability – Due Process – Fourteenth Amendment
### (Defendant Davis)

165.    Mr. Stewart repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

166.    As previously alleged, Mr. Stewart was charged with driving under the influence in part or in whole because of a document that falsely reflected that he "refused" a breathalyzer test. To the contrary, as explained above, Mr. Stewart consented to a breathalyzer test but lacked sufficient air in his lungs to complete the test as a result of the Defendants' attacking him and then refusing to provide him reasonable access to his inhaler. On information and belief, it was Morris

who falsely noted Mr. Stewart's "refusal" to complete the breathalyzer test on police records.

167.    Morris's falsification of the breathalyzer incident deprived Mr. Stewart of his procedural due process rights under the Fourteenth Amendment of the U.S. Constitution.

168.    The LSP have a demonstrable history of falsifying evidence in an attempt to either cover up troopers' misdeeds or deprive Louisianans of due process or both. LSP's reckless disregard and deliberate indifference to the constitutional rights of individuals in Louisiana was also exhibited in the cases of Antonio Harris and Ronald Greene, as illustrated above. This practice is so widespread so as to constitute an informal policy of the LSP. The LSP have actual knowledge of this policy by virtue of the many news reports about it, particularly with respect to the Harris and Greene cases in recent years.

169.    Mr. Stewart therefore seeks a declaration under 28 U.S.C. § 2201 that the conduct of the LSP (through Davis), as alleged herein, violated Mr. Stewart's rights under the Fourteenth Amendment. There is an actual controversy within this Court's jurisdiction between Mr. Stewart and Davis regarding the deprivation of Mr. Stewart's rights.

## XIX.   CAUSE OF ACTION 15
### Violation of La. Rev. Stat. Ann. § 44:1 *et seq.*
### (Defendant Gilley)

170.    Mr. Stewart repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint as though fully set forth herein.

171.    Each person's right to examine public documents is preserved by Article XII, § 3 of the Louisiana Constitution and the Public Records Law, La. Stat. § 44:31, *et seq.* In connection with Mr. Stewart's arrest, Mr. Stewart, through undersigned counsel, sought the previously listed public records from the record custodian of RPSO, Defendant Gilley, under Louisiana's Public Records Law.

-39-

172.    To date, the previously mentioned public records have not been received, including, importantly, data and information regarding complaints alleging excessive use of force or assault by RPSO officers, as well as disciplinary records related to Defendant Loftin. Further, Defendant Gilley, as custodian of records for RPSO, failed to produce the requested records within three days of receipt of Mr. Stewart's counsel's request to access the public records, nor did Defendant Gilley provide Mr. Stewart's counsel a written estimate of the time reasonably necessary for collection, redaction, examination, or review of the request. The custodians have unreasonably delayed producing the requested records, arbitrarily and capriciously withheld the requested records, and unreasonably and arbitrarily failed to respond to the request as required by § 44:31 *et seq.*

173.    Accordingly, Mr. Stewart has been deprived of his right under the Louisiana Public Records Law and is entitled to injunctive relief and/or issuance of a writ of mandamus ordering the production of the records sought, along with attorneys' fees and costs and damages incurred for bringing this action as provided for in La. Stat. § 44:35.

## XX.    JURY DEMAND

Plaintiff demands trial by jury.

## XXI.    PRAYER FOR RELIEF

Plaintiff requests that the Court enter judgment in his favor and against each of the Defendants and award the following relief:

   i.    Declaration that Defendants' conduct violated the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution;

  ii.    Compensatory and consequential damages, including damages for emotional distress, pain and suffering, and pecuniary losses on all claims allowed by law in an amount to be determined at trial;

 iii.    Compensation for economic losses on all claims allowed by law in an amount to be proven at trial;

-40-

iv.   Punitive damages on all claims allowed by law in an amount to be determined at trial;

v.   Injunctive relief ordering RPSO, through Gilley, to produce records responsive to

Plaintiff's requests under Louisiana's Public Records Law;

vi.   Attorneys' fees and costs associated with this action, including expert witness fees, on all

claims allowed by law, including reasonable attorneys' fees and costs associated with

Stewart's Public Records requests;

vii.   Pre- and post- judgment interest at the lawful rate; and

viii. Any other relief the Court deems just and proper.


Dated:  December 21, 2021                           Respectfully submitted,


                                                    /s/ Hayden M. Schottlaender
                                                    Megan E. Snider (Trial Attorney) (SBN LA 33382)
                                                    msnider@laaclu.org
                                                    Nora S. Ahmed* (SBN NY 5092374)
                                                    nahmed@laaclu.org
                                                    ACLU FOUNDATION OF LOUISIANA
                                                    1340 Poydras St, Ste. 2160
                                                    New Orleans, LA 70112
                                                    (t) 504 522 0628

                                                    Mary Z. Gaston* (SBN WA 27258)
                                                    MGaston@perkinscoie.com
                                                    PERKINS COIE LLP
                                                    1201 Third Avenue, Suite 4900
                                                    Seattle, Washington 98101-3099
                                                    (t) 206 359 9000

                                                    Hayden M. Schottlaender* (SBN TX 24098391)
                                                    HSchottlaender@perkinscoie.com
                                                    PERKINS COIE LLP
                                                    500 N. Akard Street, Suite 3300
                                                    Dallas, Texas 75201
                                                    (t) 214 965 7724

                                                    Abby L. Bloetscher* (SBN CA 312759)
                                                    ABloetscher@perkinscoie.com
                                                    PERKINS COIE LLP
                                                    505 Howard Street, Suite 1000
                                                    San Francisco, California 94105
                                                    (t) 415 344 7040

                                                    *Admitted *Pro Hac Vice*

-41-

155058993.1

*Counsel for Glen Stewart*

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2021, a copy of the foregoing *First Amended Complaint* was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record that have appeared in this action by operation of the court's electronic filing system.

*/s/ Hayden M. Schottlaender*

Hayden M. Schottlaender*
SBN TX 24098391
PERKINS COIE LLP
500 N. Akard Street, Suite 3300
Dallas, Texas 75201
(t) 214 965 7724
HSchottlaender@perkinscoie.com

155058993.1